Shaun H. Crosner (SBN 259065)
SCrosner@PasichLLP.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, CA 90266
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY R. WHITELEY,<br><br>    Plaintiff,<br><br>  vs.<br><br>USAA CASUALTY INSURANCE COMPANY,<br><br>    Defendant. | Case No. 2:24-CV-00138<br><br>**COMPLAINT FOR**<br><br>**• BREACH OF CONTRACT**<br><br>**• TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**• DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

PASICH

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jeremy R. Whiteley ("Mr. Whiteley") complains of Defendant USAA Casualty Insurance Company ("USAA") and alleges as follows:

## NATURE OF THIS LAWSUIT

1.      This is a lawsuit arising from USAA's breach of its contractual duty to defend Mr. Whiteley against liability for an underlying lawsuit titled *Breaking Code Silence v. McNamara et al.*, Case No. 2:22-cv-002052, in the Central District of California (the "*BCS* Lawsuit").  As explained below, the pleadings in the *BCS* Lawsuit include claims and allegations falling squarely within the coverage afforded under two liability policies issued by USAA—namely, Unit Owners - Homeowners Policy Number CIC 00777 83 75 90A (the "Homeowners Policy") and Personal Umbrella Policy Number CIC 00777 83 75 70U (the "Umbrella Policy") (together, the "Policies").  However, instead of honoring its duty to defend Mr. Whiteley under one or both of the Policies, USAA incorrectly denied coverage, forcing Mr. Whiteley to defend himself in the *BCS* Lawsuit.  USAA's position was, and is, contrary to the Policies it issued, the law, insurance industry custom and practice, and the facts.  Through its wrongful denial of coverage, USAA has breached its contractual obligations and acted in bad faith.

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District.

## THE PARTIES

4.      Mr. Whiteley is an individual residing in Scottsdale, Arizona.  Mr. Whiteley has been a loyal USAA member for more than 30 years.

PASICH.

2

5.      Upon information and belief, USAA is a Texas corporation with its principal place of business in San Antonio, Texas.  Mr. Whiteley is informed and believes, and on that basis alleges, that USAA is authorized to transact business, and transacts business, in the State of California and the County of Los Angeles.

6.      On its website, USAA claims to be "dedicated to the financial well-being of [its] members and their families."  *See* https://content.usaa.com/mcontent/static_assets/Media/USAA_code_of_conduct.pdf?cacheid=3705596225_p.  USAA further claims to be "dedicated to the financial well-being of [its] members and their families.  [USAA does] this by upholding the highest standards and ensuring that [its] corporate business activities and individual employee conduct reflect good judgment and strong principles that are consistent with [its] core values of Service, Loyalty, Honesty and Integrity."  *See id.*  USAA also claims to "foster a culture of trust with [its] members, coworkers and communities."  *See id.*

7.      USAA's Code of Business Ethics and Conduct further claims:

The Code of Business Ethics and Conduct ("Code") and our core values provide a foundation for protecting USAA's reputation, which is built on a legacy of unwavering commitment to ethical behavior and serving the needs of our members.  However, our reputation and the privilege of serving our member can be easily lost if our employees do not adhere to the Code.

The USAA Code guides employees in adhering to the highest standards of ethics and professional conduct, complying with laws and regulations in our day-to-day business operations, managing risk and interacting with integrity with our stakeholders, including members, fellow employees and the communities with which we are connected.

*See id.*

8.      On its website, USAA also boasts that it "ranks among the top home insurers for its customer service" and promises its insureds "quality coverage and exceptional service."  *See* https://www.usaa.com/inet/wc/insurance_home_condo.

USAA further touts the broad coverage that its homeowners' policies can provide against third-party claims, stating that "[i]f you're accused of damaging someone's reputation with libel, slander, defamation of character or other harmful actions, personal injury protection can help." *See* https://www.usaa.com/inet/wc/insurance-home-coverage.  In addition, USAA claims that "[o]ther personal liability covers other types of claims beyond bodily injury and property damage.  If you're sued for slander, libel, pain and suffering, or lost wages, an umbrella policy can help cover damages and legal fees." *See* https://www.usaa.com/inet/wc/advice-liability-protection-umbrella-insurance?akredirect=true.  USAA also boasts that "[u]mbrella insurance can also provide some financial protection from these types of claims and lawsuits that the liability insurance coverage in your home and car policies may not.

- Libel, defamation or slander
- Invasion of privacy[.]"

*See* https://www.usaa.com/inet/wc/advice-insurance-liability-benefits.  USAA further claims that "[u]mbrella coverage can help protect your finances, including the things you own, plus your savings, investments and future wages.  It could also help you avoid the stress of a lengthy lawsuit.  Plus, your umbrella insurance covers legal costs beyond the limits of your other policies." *See* https://www.usaa.com/inet/wc/insurance_home_umbrella?akredirect=true.

## THE POLICIES

### *The Homeowners Policy*

9.     For good and valuable consideration, USAA issued Mr. Whiteley the Homeowners Policy for the September 1, 2021, to September 1, 2022, policy period. A true and correct copy of at least the relevant portions of the Homeowners Policy is attached hereto as **Exhibit A** and incorporated herein by reference.

10.     The Homeowners Policy provides $1,000,000 of coverage for Personal Liability – Each Occurrence.  The Homeowners Policy's Coverage E - Personal Liability Insuring Agreement states that if a suit is brought against any "insured" for

4

PASICH.

1  damages because of "personal injury" caused by an "occurrence" to which the
2  coverage applies, USAA will "[p]ay up to the limit of liability for the damages for
3  which the 'insured' is legally liable." *See* Homeowners Policy, Personal Injury
4  Endorsement, Coverage E - Personal Liability.

5      11.    The Homeowners Policy further provides that USAA will provide a
6  defense against any lawsuit seeking such damages, "even if the suit is groundless,
7  false or fraudulent." *See id.* Coverage E - Personal Liability § 2.

8      12.    In pertinent part, the Homeowners Policy defines "personal injury" to
9  include libel, slander, defamation of character, and invasion of rights of privacy.
10 *See id.* Personal Injury Endorsement.

11     13.    The Homeowners Policy defines "occurrence" as "[a]n event or series
12 of events, including injurious exposure to conditions, proximately caused by an act
13 or omission of any 'insured,' which results, during the policy period, in 'personal
14 injury,' neither expected nor intended from the standpoint of the 'insured.'" *See id.*

15                      ***The Umbrella Policy***

16     14.    For good and valuable consideration, USAA issued Mr. Whiteley the
17 Umbrella Policy for the May 13, 2021, to May 13, 2022, policy period. A true and
18 correct copy of at least the relevant portions of the Umbrella Policy is attached
19 hereto as **Exhibit B** and incorporated herein by reference.

20     15.    The Umbrella Policy provides $5,000,000 of Umbrella Liability
21 coverage. The Umbrella Policy obligates USAA to "pay for damages that an
22 insured becomes legally obligated to pay because of personal injury.'" *See*
23 Umbrella Policy, Insuring Agreement § A. 2. Pursuant to the Umbrella Policy,
24 USAA must provide a defense against any lawsuit seeking such damages, "even if
25 the suit is groundless, false or fraudulent." *See id.* § B. 1.

26     16.    In pertinent part, the Umbrella Policy defines "personal injury" to
27 include "[o]ral, written or electronic publication of a false statement that defames a
28 person's or organization's character or reputation," as well as "[o]ral, written or

                                        5

electronic publication of material that violates a person's right of privacy by publicly disclosing private facts." *See id.*, Definitions § O.

## **THE *BCS* LAWSUIT AND USAA'S BREACHES**

17.    On or about March 28, 2022, Breaking Code Silence ("BCS"), an organization that represents children, youth, and adults who are or were incarcerated in the U.S. troubled teen industry ("TTI"), filed a complaint for damages against Katherine McNamara and Mr. Whiteley, seeking damages for alleged wrongful attempts by Mr. Whiteley and Ms. McNamara "to silence BCS and prevent BCS from communicating with the TTI-survivor community" (the "*BCS* Lawsuit").  A true and correct copy of the March 28, 2022, complaint filed in the *BCS* Lawsuit is attached hereto as **Exhibit C**.

18.    The *BCS* Lawsuit alleges that Mr. Whiteley "has engaged in acts of cyber hacking directed to BCS in California[.]"  *See id.* ¶ 7.

19.    The *BCS* Lawsuit also alleges that Mr. Whiteley was "a former BCS board member" who "originally set-up the website infrastructure for BCS to use with its domains" before terminating his relationship with BCS on or around June 28, 2021.  *See id.* ¶ 11.

20.    Among other allegations of the *BCS* Lawsuit triggering coverage under the Policies, BCS alleges:

a.    "[E]ach of the Defendants was the agent, principal, employee, representative, or alter ego of the other Defendants and/or acted with one or more of the other Defendants' knowledge, consent and approval, and acted within the course and scope of their agency or representative capacity."  *See id.* ¶ 13.  "As such, each of the Defendants is responsible for the actions of the other Defendants, as alleged herein."  *Id.*

b.    "Beginning in the fall of 2021, Defendant McNamara started creating tension on BCS's board and began regularly spreading

gossip and slanderous lies about fellow board members among volunteers and in the survivor community." *See id.* ¶ 27.

c. Ms. McNamara conspired with other volunteers and employees of BCS "to download BCS's files and confidential data, including an entire Google drive, without BCS's authority or permission[.]" *See id.* ¶ 30.

d. Defendants, including Mr. Whiteley, "formed UnSilenced, a nonprofit corporation that purports to serve the same survivor community as BCS, and seeks to achieve the identical objectives as BCS." *See id.* ¶ 33.

e. "[B]oth Defendants exercised an extreme act and maliciously accessed BCS's account with Google via the Google Search Console and possibly the back end of BCS's Website (which includes both the www.breakingcodesilence.org and www.breakingcodesilence.com domains without permission or authorization from BCS and caused the website to be deindexed on Google." *See id.* ¶ 36. "The effect of being deindexed [was] that no one could find BCS's Website on the largest search engine." *See id.*

f. "Defendant McNamara and her colleagues at UnSilenced made defamatory statements to valued partners, resulting in strained and, in some cases, terminated valued relationship." *See id.* ¶ 45.

g. "As a direct and proximate result of Defendants' wrongful conduct, BCS has suffered extensive damages[,]" including damages allegedly caused by "disclosure of misleading information to the public." *See id.* ¶ 47.

7

h.   "BCS also seeks recovery for lost goodwill as a result of Defendants' dissemination of false information by impersonating BCS."  *See id.* ¶ 48.

i.   Mr. Whiteley accessed its computers "without authorization or by exceeding authorized access" to such computers to cause BCS's "website to be deindexed."  *See id.* ¶ 56.

j.   Defendants, including Mr. Whiteley, engaged in "unauthorized access to BCS's computer systems and data."  *See id.* ¶ 75.

21.   On April 21, 2022, Mr. Whiteley timely tendered the defense of the *BCS* Lawsuit to USAA via its website and informed USAA that the suit was frivolous.

22.   Contrary to the terms of the Policies and the governing insurance law principles concerning USAA's broad duty to defend, USAA has wrongfully failed and refused to defend Mr. Whiteley in the *BCS* Lawsuit.  On information and belief, USAA has failed and refused to defend Mr. Whiteley in the *BCS* Lawsuit even though it knows that its position is incorrect under the law, the facts, and insurance industry custom and practice.

23.   As a result of USAA's wrongful denial and bad faith conduct, Mr. Whiteley has been forced to fund his own defense in the *BCS* Lawsuit.  Mr. Whiteley has taken and is taking reasonable and appropriate actions to defend against the *BCS* Lawsuit.  Mr. Whiteley has incurred, and will continue to incur, costs and expenses to defend against the *BCS* Lawsuit, and any future awards, judgments, or settlements of the *BCS* Lawsuit, the exact amount of which has yet to be ascertained.

24.   To the extent not waived or otherwise excused, Mr. Whiteley has satisfied all terms and conditions of the Policies, including the payment of premiums.  Mr. Whiteley is thus entitled to the full benefit of his insurance coverage.

***Emotional Distress to Mr. Whiteley***

25.     USAA's wrongful refusal to defend Mr. Whiteley against the *BCS* Lawsuit has depleted Mr. Whiteley's savings and has forced him to borrow substantial sums to pay for legal bills incurred in the defense against the *BCS* Lawsuit.

26.     USAA's wrongful denial of coverage has also caused intense financial stress upon Mr. Whiteley, resulting in emotional pain and suffering.

27.     As a result of the emotional distress caused by USAA's wrongful denial of coverage for the *BCS* Lawsuit, Mr. Whiteley has been forced to see a psychologist regularly for the past two years.

28.     Also as a result of the emotional distress caused by USAA's wrongful denial of coverage for the *BCS* Lawsuit, Mr. Whiteley has also been forced to retain the services of a psychiatrist.

## FIRST CAUSE OF ACTION

### (*For Breach of Contract*)

29.     Mr. Whiteley repeats and incorporates by reference the allegations of paragraphs 1 through 28 above.

30.     USAA had and has a duty under the Policies, the law, and insurance industry custom and practice to immediately defend Mr. Whiteley in the *BCS* Lawsuit.  USAA had this duty as of at least the date on which Mr. Whiteley tendered the lawsuit and sought a defense from USAA, and this duty was and is continuing through final resolution of the *BCS* Lawsuit.

31.     USAA also has a duty under the Policies, the law, and insurance industry custom and practice to indemnify Mr. Whiteley in connection with any settlement reached or judgment entered in the *BCS* Lawsuit, consistent with the express terms of the Policies.

32.     USAA has breached its duties under the Policies by, among other things:

a.    Failing and refusing to defend Mr. Whiteley in the *BCS* Lawsuit;

b.    Asserting grounds for limiting coverage for the *BCS* Lawsuit that it knows are not supported by, and in fact are contrary to, the terms of the Policies, the law, insurance industry custom and practice, and the facts;

c.    Repudiating its duty to indemnify Mr. Whiteley for any settlement or judgment entered in the *BCS* Lawsuit; and

d.    Otherwise refusing to perform its duties under the Policies.

33.    As a direct result of USAA's contractual breaches, Mr. Whiteley has suffered damages in excess of $1,375,000, plus interest at the legal rate.  Mr. Whiteley continues to suffer damages because of USAA's contractual breaches and will seek leave to amend this complaint once he ascertains the full extent of his damages.

## SECOND CAUSE OF ACTION

### (*For Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing*)

34.    Mr. Whiteley repeats and incorporates by reference the allegations of paragraphs 1 through 28 above.

35.    Implied in the Policies is a covenant that USAA would act in good faith and deal fairly with Mr. Whiteley, would do nothing to interfere with Mr. Whiteley's rights to receive the benefits due under the Policies, and would give at least the same level of consideration to Mr. Whiteley's interests as it gives to its own interests.

36.    USAA also had a duty under the Policies, the law, and insurance industry custom and practice to promptly conduct a full and thorough investigation, including all bases that might support Mr. Whiteley's claim for coverage.

37.    Instead of complying with these duties, USAA acted in bad faith and in conscious disregard of Mr. Whiteley's rights by, among other things:

a.    Failing and refusing to defend Mr. Whiteley in the *BCS* Lawsuit;

10

PASICH

b. Asserting grounds for disputing coverage that it knows are not supported by, and are contrary to, the terms of the Policies, the law, insurance industry custom and practice, the parties' course of dealings, and the facts;

c. Failing to conduct an adequate investigation of Mr. Whiteley's claim for coverage, and asserting grounds for disputing coverage based on its inadequate investigation;

d. Failing to fully inquire into possible bases that might support coverage for Mr. Whiteley's losses;

e. Giving greater consideration to its own interests than Mr. Whiteley's interests; and

f. Otherwise acting as alleged above.

38. In breach of the implied covenant of good faith and fair dealing, USAA did the things and committed the acts alleged above for the purpose of consciously withholding from Mr. Whiteley the rights and benefits to which he is entitled under the Policies.

39. USAA's acts are inconsistent with Mr. Whiteley's reasonable expectations, are contrary to established claims practices and legal requirements, and constitute bad faith.

40. As a direct and proximate cause of USAA's bad faith conduct and other actions described above, Mr. Whiteley has sustained at least $1,375,000 in damages, plus interest at the legal rate. Mr. Whiteley continues to suffer damages because of USAA's bad faith and will seek leave to amend this Complaint once he ascertains the full amount of his damages. Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), and/or other applicable authority, Mr. Whiteley is entitled to recover all attorneys' fees and expenses that he has reasonably incurred, and is incurring, in his efforts to obtain the policy benefits that USAA has wrongfully withheld, and is withholding, in bad faith. Mr. Whiteley is also entitled to interest thereon at the

PASICH

maximum legal rate.  Finally, Mr. Whiteley is entitled to recover damages to compensate him for his emotional pain, suffering, and distress resulting from USAA's bad faith and other conduct described above.

41.     Mr. Whiteley is informed and believes, and on that basis alleges, that USAA—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of USAA's business—performed, authorized, and/or ratified the bad-faith conduct alleged above.

42.     USAA's conduct is despicable and has been done with a conscious disregard of Mr. Whiteley's rights, constituting oppression, fraud, and/or malice. USAA engaged in a series of acts designed to deny the benefits due under the Policies.  Specifically, USAA, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded Mr. Whiteley's rights and forced Mr. Whiteley to incur substantial financial losses, without any assistance from it, thereby inflicting substantial financial damage on Mr. Whiteley. USAA ignored Mr. Whiteley's interests and concerns, with the requisite intent to injure, and acted fraudulently.  Therefore, Mr. Whiteley is entitled to recover punitive damages from USAA in an amount sufficient to punish and make an example of USAA and in order to deter similar conduct.

### THIRD CAUSE OF ACTION

#### (*For Declaratory Relief*)

43.     Mr. Whiteley repeats and incorporates by reference the allegations of paragraphs 1 through 28 above.

44.     A controversy exists between Mr. Whiteley and USAA.  Mr. Whiteley contends that USAA has a duty to defend and indemnify Mr. Whiteley in connection with the *BCS* Lawsuit.  USAA has not provided a defense, paid for any portion of Mr. Whiteley's defense, or otherwise reimbursed Mr. Whiteley for his defense fees and costs, and has contended that it is not obligated to do so.  USAA also has

repudiated any obligation to indemnify Mr. Whiteley for any settlement or judgment in the *BCS* Lawsuit.

45.     Therefore, declaratory relief is necessary to determine Mr. Whiteley's rights under the Policies.  Specifically, Mr. Whiteley seeks a declaration from the Court that USAA is obligated to defend and indemnify him in the *BCS* Lawsuit.

46.     A declaration is necessary at this time so that the parties' dispute may be resolved and that the parties may be aware of their respective rights and duties.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Whiteley prays for relief as follows:

### ON THE FIRST CAUSE OF ACTION

1.     For damages according to proof at the time of trial, plus interest;

### ON THE SECOND CAUSE OF ACTION

2.     For damages according to proof at the time of trial, including reasonable attorneys' fees incurred in obtaining the benefits due under the Policies, plus interest;

3.     For damages to compensate Mr. Whiteley's emotional pain, suffering, and distress resulting from USAA's bad faith conduct; and

4.     For punitive damages in an amount to be determined at the time of trial;

### ON THE THIRD CAUSE OF ACTION

5.     For a declaration in accord with Mr. Whiteley's contentions stated above;

### ON ALL CAUSES OF ACTION

6.     For costs of suit incurred herein; and

7.     For such other, further, and/or different relief as may be deemed just and proper.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

DATED: January 5, 2024                    PASICH LLP

                                   By: /s/ Shaun H. Crosner
                                        Shaun H. Crosner
                                        Attorneys for Plaintiff

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# **DEMAND FOR JURY TRIAL**

Mr. Whiteley hereby demands a trial by jury in this action for those claims that may be tried by jury under the law.


DATED: January 5, 2024                PASICH LLP


By: */s/ Shaun H. Crosner*
Shaun H. Crosner
Attorneys for Plaintiff

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# EXHIBIT A



# HOMEOWNERS POLICY PACKET

EFFECTIVE: 09-01-21 TO: 09-01-22

JEREMY R WHITELEY
6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE AZ 85257-3105

CIC      00777 83 75      90A

## IMPORTANT MESSAGES

Refer to your Declarations Page and endorsements to verify that coverages, limits, deductibles and other policy details are correct and meet your insurance needs.  Required information forms are also enclosed for your review.

1) USAA considers many factors when determining your premium.  Maintaining your property to reduce the probability of loss is one of the most important steps you can take toward reducing premium increases.  A history of claim activity will affect your policy premium.

2) Please compare the coverage provided by your USAA policy to that provided by your Condominium Association's or Cooperative's Master Insurance policy, to ensure that the combined coverage meets your insurance needs.

3) Your policy does NOT cover loss due to flood from any source. For information about obtaining flood coverage from the National Flood Insurance Program (NFIP), call USAA at (800) 531-8722, or contact the NFIP directly.

   If you already have a flood policy, you should review it to make sure you have the appropriate coverage and limits. No automatic increases or adjustments are applied to your policy. Coverage for loss of household contents due to flood may be available at an additional cost. If you have questions, please call a member service representative at the phone number above.

4) Claims involving damage to your unit should be submitted to both USAA and the Condominium Association's or Cooperative's Master insurance company, so that the primary policy can be determined.  Your USAA policy provides excess coverage to the Master Policy.

This is not a bill.  Any premium charge or return for this policy will be reflected on your next regular monthly statement.
**To receive this document and others electronically or view your policy summary online, go to usaa.com.**
For U.S. Calls:  Policy Service (800) 531-8111.  Claims (800) 531-8222.
HOCS1                                                                      49709-0406

THIS PAGE INTENTIONALLY LEFT BLANK

**USAA CASUALTY INSURANCE COMPANY**

**9800 Fredericksburg Road - San Antonio, Texas 78288**

RENEWAL DECLARATIONS PAGE

| Named Insured and Residence Premises | Policy Number |
|---|---|
| JEREMY R WHITELEY | CIC   00777 83 75   90A |

6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE, MARICOPA, AZ   85257-3105

Policy Period From:  09/01/21      To:  09/01/22
(12:01 A.M. standard time at location of the residence premises)

---

**SECTION I -  COVERAGES AND AMOUNTS OF INSURANCE**

| | |
|---|---|
| COVERAGE A - DWELLING PROTECTION | $122,000 |
| COVERAGE C - PERSONAL PROPERTY PROTECTION | $20,500 |
| COVERAGE D - LOSS OF USE PROTECTION(UP TO 12 MONTHS) | $8,200 |

**SECTION II - COVERAGES AND LIMITS OF LIABILITY**

| | |
|---|---|
| Personal Liability – Each Occurrence | $1,000,000 |
| Medical Payments to Others | $5,000 |

**DEDUCTIBLES (Applies to SECTION I Coverages ONLY)**

We cover only that part of the loss over the deductible stated.

| | |
|---|---|
| ALL PERILS | $1,000 |

| | |
|---|---|
| **POLICY PREMIUM for Section I and Section II Coverages Above** | $938.35 |

**CREDITS AND DISCOUNTS** (Included in policy premium above.)   $366.36 CR
Details on the following page. (If applicable)

| | |
|---|---|
| **OTHER COVERAGES AND ENDORSEMENTS** | $63.65 |

Forms and Endorsements are printed on the following page.

**STATE SURCHARGES AND TAXES** (Shown below if applicable)

**TOTAL POLICY PREMIUM**
Including Credits, Discounts, Optional Coverages, Endorsements, State Surcharges and Taxes

| | |
|---|---|
| | $1,002.00 |

PREMIUM DUE AT INCEPTION. THIS IS NOT A BILL. STATEMENT TO FOLLOW.

---

**FIRST MORTGAGEE:**
BECU
ITS SUCCESSORS AND/OR ASSIGNS, ATIMA            LOAN NR       0145954244
C/O CENLAR, PO BOX 202028
FLORENCE, SC 29502-2028

In witness whereof, this policy is signed on  06/23/21

Karen Morris, Secretary        James Syring, President

**REFER TO YOUR POLICY FOR OTHER COVERAGES, LIMITS AND EXCLUSIONS.**

HO-D1 (07-08)            ATTACH THIS DECLARATION TO PREVIOUS POLICY          87028-0708

**USAA CASUALTY INSURANCE COMPANY**

RENEWAL DECLARATIONS PAGE

| | **Policy Number** | | **Policy Term:** | 09/01/21 | 09/01/22 |
|---|---|---|---|---|---|
| CIC | 00777 83 75 | 90A | | **Inception** | **Expiration** |

POLICY AND ENDORSEMENTS THAT ARE PART OF YOUR CONTRACT WITH US.

REMAIN IN EFFECT (Refer to prior Policy Packet(s) for documents not attached.):

| | | |
|---|---|---|
| QR6CIC(02) | (07-08) | QUICK REFERENCE-UNIT-OWNERS |
| HO-6R(02) | (07-08) | UNIT-OWNERS FORM |
| HO-ACP | (07-12) | AMENDMENT TO CONTRACT PROVISIONS |
| HO-AZ | (08-16) | ARIZONA SPECIAL PROVISIONS |
| HO-HS | (04-18) | SHARING ECONOMY ENDORSEMENT |
| HOSLS6(02) | (07-08) | SPECIAL LOSS SETTLEMENT |
| 438BFU NS | (05-42) | LENDER'S LOSS PAYABLE ENDORSEMENT |
| HO-208 | (07-12) | WATER BACKUP OR SUMP PUMP OVERFLOW |
| HO-32(04) | (07-16) | UNIT-OWNERS SPECIAL COVERAGE A |
| HO-41 | (08-09) | ADDITIONAL INSURED |
| HO-728 | (07-12) | REPLACEMENT COST COVERAGE |
| HO-82 | (07-08) | PERSONAL INJURY LIABILITY | $47.38 |

ADDED:

| | | | |
|---|---|---|---|
| HO-513 | (07-08) | PERSONAL COMPUTER COVERAGE | $16.27 |

YOUR PREMIUM HAS BEEN REDUCED BY THE FOLLOWING CREDITS AND DISCOUNTS:

| | |
|---|---|
| AUTO AND HOME COMBINATION DISCOUNT | $197.27 CR |
| MULTI-PRODUCT DISCOUNT OTHER P&C | $16.97 CR |
|   Umbrella | |
| MULTI-PRODUCT DISCOUNT BANK | $16.97 CR |
| MULTI-PRODUCT DISCOUNT LIFE | $16.97 CR |
| LOYALTY DISCOUNT | $25.74 CR |
| CLAIMS FREE DISCOUNT | $92.44 CR |

**HO-D2** (07-08)                    06/23/21

87029-0708

CIC      00777 83 75      90A

HO-513 (07-08)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### PERSONAL COMPUTER COVERAGE
(SECTION I – ADDITIONAL COVERAGES)

For an additional premium the following ADDITIONAL COVERAGE is added:

Amount of Insurance          $5,000

**AGREEMENT**

We will provide coverage, up to the amount of insurance stated above, for direct physical loss to the property described below.

**DEFINITIONS**

With respect to the coverage provided by this endorsement the following definitions are added:

**"personal computer"** means a personal desktop or laptop computer.

**"peripheral device"** means any physical unit used to operate the **personal computer** that cannot be used for purposes other than as part of the computer system, such as tape or disc drives, printers, or modems.

**"peripheral device"** does not include cameras, media players, game systems, communication systems, personal digital assistants and medical devices.

**"software"** means electronic data processing media, programs, discs, and tapes used solely with the **"personal computer"** and the instructions that came with the **"software "**.

**ADDITIONAL COVERAGE**

If owned by or leased to you, we cover any legal, personal or **business** use of **personal computers, peripheral devices** and **software.**

We do not cover:

a.  **"personal computers", "peripheral device"** or **"software"** rented to others, or held for rental.

b.  **"software"** stored data except as provided under Special Limits of Liability, item 2.

**PERSONAL PROPERTY PROTECTION**

The following provisions are deleted with respect to coverage under this endorsement:

• Our amount of insurance for personal property usually located at any **"insured's"** residence, other than the **"residence premises"** is 10% of the amount of insurance for Personal Property Protection, or $1,000 whichever is greater.

• Under Special Amounts of Insurance, items 9. (a) and (b) are deleted with respect to the amount of coverage provided under this endorsement.

**DEDUCTIBLE**

A $250 deductible applies to a loss covered under this endorsement. Only this endorsement's deductible shall apply to any loss covered under both the endorsement and the policy to which it is attached.

**SECTION I - LOSSES WE DO NOT COVER**

With respect to the coverage provided by this endorsement only the following exclusions apply.

We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

1.  Mechanical breakdown, faulty construction, or error in **"personal computer", "peripheral device"** or **"software"** design.

2.  Wear and tear, marring, deterioration, corrosion or obsolescence.

3.  Birds, vermin, rodents, insects, or animals owned by or kept by an **"insured"**.

87051-0708
Page 1 of 2

**HO-513  (07-08)**

4. Nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

   Direct loss by fire, if it results from nuclear reaction, nuclear radiation, or radioactive contamination, is covered.

**WE DO NOT COVER**

- Loss of use, or

- Indirect or consequential loss of any kind.

**Other Insurance**

The following provisions are added with respect to coverage under this endorsement:

- If a loss is covered under both this endorsement and the policy to which this endorsement is attached, the policy will pay only when the limit of this endorsement has been exhausted.

- If you have been reimbursed by the U.S. Government under 31 USC 3721, commonly referred to as the Military Personnel and Civilian Employees Claims Act, as amended and supplemented, or any successor or replacement act, this endorsement provides excess coverage for a covered loss.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

Term Premium:        $16.27

Copyright, USAA, 2008. All rights reserved.

# ARIZONA SUMMARY OF RIGHTS

We're required by your state's insurance laws to provide you with the following information.

**Your Rights Following an Adverse Underwriting Decision**

In the event of an adverse underwriting decision, we will provide you notice of the decision and you have the following rights.

You have 90 business days from the date of the mailing of the notice to request an explanation. We will respond to your request within 21 business days of receipt of your written request with the following information if it is not included in the original decision notice:

- The specific reason for the adverse underwriting decision; and

- The specific items of personal and privileged information that support those reasons, except that we may not disclose certain privileged information about you, nor will we disclose the specific items of medical record information supplied by a medical care institution or medical professional either directly to you or your designated medical professional.

We will disclose the names and addresses of the institutional sources that supplied the specific items of personal or privileged information, and we will only disclose any medical professional or medical care institution information directly to you or to your designated medical professional.

**Your Right to Access Your Recorded Personal Information**

If we or an insurance support organization (ISO) make a record of your personal information, you have the right to submit a written request for access to your record. Within 30 business days of the receipt of your request for access to your recorded personal information, we or the ISO will inform you of the nature and substance of the recorded personal information, and the response will address the following:

- A description of your right to see and copy, in person, the personal information record, or obtain a copy by mail, whichever you prefer. We or the ISO will disclose to you the identity, if recorded, of those persons to whom we or the ISO have disclosed the personal information within two years prior to your request; if we or the ISO do not have the identity of the person, we will provide the names of those institutions or persons to whom the information is normally disclosed. We or the ISO will provide you with a summary of the procedures by which you may request that we correct, amend or delete your recorded personal information in our possession or in the possession of the ISO.

- We or the ISO will identify whether the source of any personal information is from an institutional source.

- If the information is a medical record supplied by a medical care institution or medical professional, we or the ISO will identify the medical professional or medical care institution which provided the information either directly to you or to a licensed medical professional designated by you. We will notify you if we elect to disclose the information to a medical professional designated by you.

**Your Right to Correct, Amend or Delete Recorded Personal Information**

If we or the ISO possess any recorded personal information about you, you may send us or the ISO a request that we correct, amend or delete this recorded personal information. When we or the ISO receive your written request to correct, amend, or delete any personal information about you, we or the ISO will respond within 30 business days of the receipt of the written request. The response from us or the ISO will either:

- Show that we agree to correct, amend, or delete the portion of the recorded personal information in dispute; or

- Notify you of our refusal to make the correction, amendment, or deletion, explain the reasons for the refusal, and inform you of your right to file a statement if you disagree.

If we or the ISO correct, amend or delete your recorded personal information, we or the ISO will notify you in writing and furnish the correction, amendment, or fact of deletion to any person specifically designated by you who within the preceding two years may have received the recorded personal information.

If you disagree with our refusal or the ISO's refusal to correct, amend, or delete recorded personal information, you may file with us or the ISO a concise statement setting forth what you think is the correct, relevant, or fair information and a concise statement of the reasons why you disagree with the decision to refuse to correct, amend, or delete recorded personal information. Your response will be added to your file with us or if you are sending a response to the ISO, your response will be added to its file.

**How to Request Information from USAA**

Please send your written request to USAA at 9800 Fredericksburg Road, San Antonio, Texas 78288, Attention: P&C Underwriting.

CIC    00777 83 75    90A

9800 Fredericksburg Road
San Antonio, Texas 78288

**USAA®**

## NOTICE OF INFORMATION PRACTICES

This notice describes the information practices of the:
- United Services Automobile Association,
- USAA Casualty Insurance Company,
- USAA General Indemnity Company, and
- Garrison Property and Casualty Insurance Company.

These practices relate to the information we have about you. You may have also received our "Privacy Promise." However, the laws in your state require that we give you this notice.

### COLLECTION OF INFORMATION

We collect information about you, and the individuals you add on your policy, from various sources. This data may be gathered from you and other sources by telephone, in person, electronically, or by mail. Some examples are shown below:
- Information you provide on applications and other forms, such as name, address, and date of birth.
- Information about your transactions with us, or with other companies. This means, for example, a request for a new policy, a policy change, or a billing transaction.
- Information from consumer reporting agencies, such as a motor vehicle report.
- Data from research firms and other data providers.
- Information gathered during the process of handling insurance claims, including health information.
- Information from government agencies, such as accident or theft reports.

### SHARING OF INFORMATION AS PERMITTED BY LAW

We may need to share some information about our current or former customers outside of USAA to properly manage our business. This includes sharing to efficiently service your accounts, to comply with laws, and for other routine business practices. For example, we may share such information with:
- You, when handling your insurance transactions.
- Our affiliates.
- Businesses that provide information to us or assist us in settling claims. This may involve other insurers, medical care institutions or professionals, or repair shops.
- Regulatory, law enforcement, or other government agencies.
- Those who provide a business service or help us with an insurance function, such as printers, mail houses, appraisers, or insurance support organizations.
- Those who assist us in detecting or preventing criminal activity, fraud, material misrepresentation, or material nondisclosure in connection with an insurance transaction.
- Those who serve us with a facially valid administrative or judicial order, including a search warrant or subpoena.
- Those who conduct actuarial or research studies.

### IMPORTANT PRIVACY CHOICES

USAA provides two privacy opt out choices: (1) limit the information USAA uses for marketing and (2) limit the flow of information within USAA. You may opt out online by updating your Privacy Preferences at usaa.com/optout, or by calling us at (800) 531-7154. Opting out will make it difficult for us to serve you as you might expect. If you opt out:
- We may need you to repeat information that you have already provided and we may not be able to pre-fill applications for you.
- We may have to transfer your phone calls more often.
- We may not have information that allows us to offer you the products that best meet your needs.

**NIP-F-PP(05)** Rev. 01-14

50857-0214__01
Page 1 of 2

**AUTHORIZATION TO SHARE**
We honor any additional rights you may have under state laws. By not opting out, you authorize us to use and share your information within USAA.

**SECURITY AND CONFIDENTIALITY PRACTICES**
USAA protects the information we collect. Access to this information is limited to those persons who must have it to do their jobs. We also have:
- Physical security at our buildings.
- Password protected databases and virus/intrusion detection software.
- Privacy compliance audits.

**INFORMATION FOR INTERNET USERS**
USAA uses Internet cookies and related technology for your security, to manage our site and to provide more relevant offers. Visit our Security Center at usaa.com to learn more.

USAA collects personal information on USAA websites, web pages and "apps", as well as public information posted on social media, for site management, security, business and marketing purposes. Examples of information we may collect include: previous URL you visited, transaction information you submit, and clicks on USAA ads and related pages.

**REVIEWING AND CORRECTING PERSONAL INFORMATION**
You may review our files of personal information about you. You may do this in person or request a copy. We are not required to provide information that relates to any claim, whether paid or not, or when the possibility of a lawsuit exists.

The review request must:
- Be in writing.
- Specify the type of personal information you wish to review.
- Include your name, address, and policy number.
- Be mailed to: USAA, 9800 Fredericksburg Road, San Antonio, Texas 78288-0342

After we receive your request, we will:
- Inform you of the nature of the information we have.
- Confirm if the data you are requesting is available.
- Advise you of processing and copy fees. These fees are due before we provide any copies you request.

If you request medical information supplied by a medical care institution or professional, we will tell you the source of the information. Some states do not allow us to release all or certain information directly to you. If your state allows us to release information directly to you, we will do so upon receiving your formal request. We can also release your information to the licensed medical professional you designate upon receiving your formal request.

You may also request that we correct, amend, or delete incorrect personal information we have about you. This request must:
- Be made to us in writing.
- Be made separate from a review request.
- Explain what you believe is incorrect and why.
- Be mailed to the address given above.

**INSURANCE SUPPORT ORGANIZATIONS AND THE INFORMATION RETAINED**
Insurance support organizations may keep information they give us. These firms may share that information with other persons as permitted by law.

HO-82 (07-08)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

PERSONAL INJURY ENDORSEMENT

For an additional premium, Section II – LIABILITY COVERAGES, **COVERAGE E - Personal Liability** is deleted and replaced by the following:

### COVERAGE E - Personal Liability

If a claim is made or a suit is brought against any **"insured"** for damages because of **"bodily injury"**, **"property damage"** or **"personal injury"** caused by an **"occurrence"** to which this coverage applies, we will:

1. Pay up to the limit of liability for the damages for which the **"insured"** is legally liable; and
2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.  We may investigate and settle any claims or suit that we decide is appropriate.  Our duty to settle or defend ends when the amount we pay or tender for **"damages"** resulting from the **"occurrence"** equals our limit of liability.  This coverage does not provide defense to any **"insured"** for criminal prosecution or proceedings.

We will not pay for punitive **"damages"** or exemplary **"damages"**, fines or penalties.

The following definition is added:

**"Personal Injury"** means:

   a. Wrongful eviction, wrongful entry.
   b. Libel.
   c. Slander.
   d. Defamation of character.
   e. Invasion of rights of privacy.
   f. Wrongful detention, false arrest or false imprisonment.
   g. Malicious prosecution or humiliation.
   h. Assault and battery if committed by any insured or at his direction to protect persons or property.  This applies only when the conduct is not criminal.

**"Personal injury"** only applies when the conduct is not malicious or criminal in nature.

The definition of **"occurrence"** is deleted and replaced by the following:

**"Occurrence"** means:

   a. An accident, including continuous or repeated exposure to substantially the same generally harmful conditions, which results, during the policy period, in **"bodily injury"** or **"property damage"**.
   b. An event or series of events, including injurious exposure to conditions, proximately caused by an act or omission of any **"insured"**, which results, during the policy period, in **"personal injury"**, neither expected nor intended from the standpoint of the **"insured"**.

### SECTION II - EXCLUSIONS

Under Item 1. **Coverage E - Personal Liability** and **Coverage F - Medical Payments to Others,** with respect to personal injury only, paragraph a., is deleted and replaced by:

   a. which is expected or intended by the **"insured"**:

The following exclusions are added with respect to **"personal Injury"**:

1. Arising out of an **"insured's"** activities as an officer or director of any organization; this does not apply to non-profit religious or charitable organizations when the activity is not connected with the **"insured's"** **"business"**, profession or occupation and the **"insured"** is not compensated for the activity.

HO-82  (07-08)

87034-0708
Page 1 of 2

Coverage for officers or directors of religious or charitable organization does not extend in any way to liability which arises out of, involves or is directly or indirectly founded upon any person's or organization's rendering or failure to render:

a.  clinical services;
b.  mental, dental or physical health services;
c.  medical services of any kind, including therapeutic or rehabilitative services;

2.  Arising out of discrimination and violation of civil rights where recovery is permitted by law.

3.  Arising out of any actual, alleged or threatened:

    a.  sexual misconduct;
    b.  sexual harassment; or
    c.  sexual molestation.

4.  Arising out of any actual, alleged or threatened physical or mental abuse.

5.  Arising out of libel, slander or defamation of character that is published by the **"insured"** on the internet.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

**Term Premium:**                $61.00

Copyright, USAA, 2008. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**HO-82 (07-08)**                                    Page 2 of 2

# EXHIBIT B



CIC 00777 83 75 70U
1063X
DM-03037

**UMBRELLA POLICY PACKET**

Effective: 05/13/2021 to 05/13/2022
CIC 00777 83 75 70U

**Important Messages**

Refer to your Declarations Page and endorsements to verify that coverage, limits and other policy details are correct and meet your insurance needs. Required information forms are also enclosed for your review.

Please read the enclosed form entitled "Notice of Information Practices" regarding privacy information.

This is not a bill. Any premium charge or return for this policy will be reflected on your next regular monthly statement. To receive this document and others electronically or to view your policy summary online, go to usaa.com. You may also contact us at 210-531-USAA (8722), our mobile shortcut #8722 or 800-531-USAA (8722).

PU-CS (07-09)

89855-0709
Page 1 of 1



**Make Sure Coverage is Adequate: Review Umbrella Exposures and Check Policy**

**It's important to review your umbrella policy** as it provides liability coverage for a covered loss that exceeds the minimum required liability limits for the applicable personal insurance coverage shown in the **Schedule of Underlying Insurance on the Declarations Page**.

If the insurance policies on all your vehicles, properties and watercraft are not maintained with at least the minimum required liability limits, there will be a gap in coverage between the limit on the underlying personal insurance policy and your personal umbrella policy.

In the event of a covered claim, you will be responsible for paying the difference between the required underlying limit and the actual liability coverage limits on the underlying insurance policies before your umbrella policy will provide coverage.

**Note:** If all your personal underlying insurance policies covered by your umbrella policy are insured with a USAA Group insurance policy and the coverage limits shown on the **Supplement Declarations Page** are at least the minimum required limits, there is no need for any adjustments to your underlying policies. However, you may wish to review each individual underlying policy to ensure there is no gap in coverage.

If any members of your household have personal insurance policies insured with USAA, with another insurance company through a USAA Insurance Agency relationship or elsewhere, or you have personal insurance policies insured with another insurance company through a USAA Insurance Agency relationship or elsewhere, please ensure the policies have at least the minimum liability limits required by your USAA umbrella policy.

**Your personal umbrella policy must include** all drivers in the household and anyone who regularly drives any of your vehicles. Your umbrella policy also must include all vehicles, properties and watercraft you own, finance, lease, or co-own.

**Refer to your Personal Umbrella Policy** for coverages explanation, limitations and exclusions.

CIC 00777 83 75 70U
DM-03037



**USAA CASUALTY INSURANCE COMPANY**
(A Stock Insurance Company)
9800 Fredericksburg Road, San Antonio, Texas 78288
**PERSONAL UMBRELLA POLICY DECLARATIONS -** New

Policy Number: CIC 00777 83 75 70U

Effective: From 05/13/2021 to 05/13/2022
(12:01 A.M. standard time at Umbrella Base Location)

Named Insured and Mailing Address:
JEREMY R WHITELEY
6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE AZ 85257-3105

Umbrella Base Location:
6721 E Mcdowell Rd
Scottsdale, Maricopa, AZ 85257

|  | Limit (per occurrence) | Premium |
|---|---|---|
| Umbrella Liability | $5,000,000 | $867.31 |
|  | **Total** | **$867.31** |

PREMIUM DUE AT INCEPTION

### SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF INSURANCE | REQUIRED MINIMUM LIMITS | | | |
|---|---|---|---|---|
|  | Bodily Injury | Property Damage | OR | Combined Single Limit |
| Private Passenger Vehicle Liability | $300,000/$500,000 | $100,000 | OR | $500,000 |
| Miscellaneous Vehicle Liability | $250,000/$500,000 | $100,000 | OR | $500,000 |
| Personal Liability |  |  |  | $300,000 |
| Watercraft/Pers Watercraft Liability |  |  |  | $300,000 |

**USAA requires you to maintain NO LESS THAN the above REQUIRED MINIMUM LIMITS. See the Required Minimum Insurance Condition in your policy.**

**Please verify your actual limits and exposures on the attached Supplemental Declarations.**

ENDORSEMENTS - PU-100AZ (07-09), PU-2009 (07-09), PU-2011 (04-11)

INFORMATIONAL FORMS  - UMBAZSR(1) 7-20, UMBNIP (01-14), UMBUL (11-19)

In WITNESS WHEREOF, we have caused this policy to be signed by our President and Secretary at San Antonio, Texas, on this date 05/12/2021.

*Isaac Johnson*
Isaac Johnson, Secretary

*James D. Syring*
James Syring, President
89853-0513
Page 1 of 1

PU2009D (05-13)

CIC 00777 83 75 70U



# PERSONAL UMBRELLA POLICY
## Supplemental Declarations

**Effective:**
From **05/13/2021** to **05/13/2022**
(12:01 a.m. standard time at Umbrella Base Location)

Your Umbrella premium is based in part on the following. The limits shown below represent the lowest policy limits carried.

Please contact us if any changes are needed.

## DESCRIPTION OF KNOWN EXPOSURES

**Motor Vehicles (Includes Private Passenger and Miscellaneous Vehicles):**
    **Lowest Coverage Limit(s):** $1,000,000/$1,000,000/$300,000

1995 MERCEDES E CLS SW 320
2003 MERCEDES G CLS 500

**Properties/Residences:**
    **Lowest Coverage Limit:** $1,000,000

6721 E Mcdowell Rd Unit 322c, Scottsdale, Maricopa, AZ 85257

CIC 00777 83 75 70U



**USAA**
9800 Fredericksburg Road
San Antonio, Texas 78288

---

## PERSONAL UMBRELLA POLICY

### READ YOUR POLICY, DECLARATIONS AND ENDORSEMENTS CAREFULLY

This policy is a legal contract between the named insured and the company shown on the Declarations. And like other contracts, it contains certain duties and responsibilities of both parties to the contract.  This contract consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

This is a participating policy. You are entitled to dividends as may be declared by the company's Board of Directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

- By purchasing this policy you are a member of USAA and are subject to its bylaws.

- This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.

- The USAA Board of Directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

## QUICK REFERENCE

|  |  | **DECLARATIONS PAGE** |
|---|---|---|
|  |  | Named Insured and Address |
|  |  | Policy Period |
|  |  | Policy Limits and Premiums |
|  |  | Schedule of Underlying |
|  |  |    Insurance |
|  |  | Endorsements |
| Beginning on Page | **2** | **Agreement and Definitions** |
|  | **4** | **Liability Coverages** |
|  |  | Insuring Agreement |
|  |  |    Damages |
|  |  |    Defense |
|  |  | Limit of Liability |
|  |  |    Damages |
|  |  |    Defense |
|  | **5** | **Exclusions** |
|  | **8** | **Conditions** |
|  |  | Bankruptcy |
|  |  | Concealment, |
|  |  |    Misrepresentation or Fraud |
|  |  | Duties After An Occurrence or |
|  |  |    Offense |
|  |  | Other Insurance |
|  |  | Our Right to Recover |
|  |  |    Payment |
|  |  | Ownership |
|  |  | Required Underlying Limits |
|  |  | Spouse Access |
|  |  | Suit Against Us |
|  |  | Termination |
|  |  |    Cancellation |
|  |  |    Nonrenewal |
|  |  |    Other Termination |
|  |  |    Provisions |
|  |  | Transfer of Your Interest in |
|  |  |    This Policy |
|  |  | Waiver or Change of Policy |
|  |  |    Provisions |

CIC 00777 83 75 70U

---

## AGREEMENT

In return for payment of premium and subject to all terms of this policy, we will provide the insurance described.

However, this policy provides no uninsured motorists coverage, underinsured motorists coverage, auto no-fault coverage or medical payments coverage.

---

## DEFINITIONS

The words defined below are used throughout this policy.  They are in **boldface** when used.

A. "**You**" and "**your**" refer to the "named insured" shown on the Declarations and spouse if a resident of the same household.

B. "**We**," "**us**" and "**our**" refer to the Company providing this insurance.

C. "**Aircraft**" means any conveyance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

D. "**Bodily injury**."

   1. "**Bodily injury**" means bodily harm, sickness, disease or death.

   2. "**Bodily injury**" does not include mental injury such as emotional distress, mental anguish, humiliation, mental distress, or any similar injury unless it arises out of physical injury to some person.

E. "**Business**" means any full or part-time activity arising out of or related to any trade, profession or occupation of any **insured**.

F. "**Business property**" means any property on which a **business** is conducted.

G. "**Driving contest or challenge**" includes, but is not limited to:

   1. A competition against other people, vehicles, or time; or

   2. An activity that challenges the speed or handling characteristics of a vehicle or improves or demonstrates driving skills, provided the activity occurs on a track or course that is closed from non-participants.

H. "**Family member**" means a person related to **you** by blood, marriage, or adoption who is a resident of **your** household. This includes a ward or foster child who is a resident of **your** household.

I. "**Fungus**" or "**fungi**" means any microorganism or byproduct of any microorganism, including but not limited to mold, mildew, fungi, mycotoxins and spores.

J. "**Hovercraft**" means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles.

K. "**Insured**."

   1. "**Insured**" means:

     a. **You** and any **family member**;

     b. Other residents of **your** household under the age of 21 and in the care of **you** or any **family member**;

     c. Any person or organization legally responsible for animals, **watercraft** or **personal watercraft**:

       (1) To which this policy applies; and

       (2) Which are owned by any person in K.1.a. or K.1.b. above.

     d. Any person using a **motor vehicle**, **watercraft** or **personal watercraft** to which this policy applies, provided that such use is with the consent of any **insured**.

   2. However, "**insured**" does not include:

a. The owner of a **motor vehicle**, **watercraft** or **personal watercraft** loaned or rented to any **insured**. "Owner" in this paragraph includes the owner's agents or employees.

b. Any **motor vehicle** sales agencies, repair shops, service stations, storage garages or public parking lots, their owners, agents or employees.

c. Any shipyards, **watercraft** repair yards, marinas, yacht clubs, **watercraft** sales agencies, **watercraft** service stations and the like, their owners, agents or employees.

d. The lessee of a **motor vehicle**, **watercraft** or **personal watercraft** owned by any **insured**.

e. A person or organization using or having custody of animals, **watercraft** or **personal watercraft**, to which this policy applies, in the course of any **business** or without the consent of any **insured**.

L. "**Miscellaneous vehicle**" means the following motorized vehicles: all terrain vehicles; antique vehicles; classic vehicles; dune buggies; golf carts; motorcycles; motor homes; and snowmobiles.

M. "**Motor vehicle**" means any type of motorized land vehicle or conveyance, whether or not subject to motor vehicle registration.  **Motor vehicle** includes:

1. Private passenger vehicles, other than antique vehicles and classic vehicles; and

2. **Miscellaneous vehicles**.

N. "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in **bodily injury** or **property damage**.

O. "**Personal injury**" means injury arising out of one or more of the offenses listed below, but only if the **insured's** act occurred during the policy period.  A series of similar or related acts by an **insured**, multiple publications of the same statement, and continuous or repeated injury from the same act or publication, will be considered a single offense and injury during the single policy period in which the first act or publication occurred.

1. Oral, written or electronic publication of a false statement that defames a person's or organization's character or reputation.

2. Oral, written or electronic publication of material that violates a person's right of privacy by publicly disclosing private facts.

3. Malicious prosecution.

4. False arrest, false imprisonment, wrongful detention.

5. When committed by or on behalf of the owner, landlord or lessor of a room, dwelling or premises that a person occupies:

a. Wrongful eviction;

b. Wrongful entry; or

c. Invasion of the right of private occupancy.

6. Assault and battery if committed by any **insured**, or at his direction, to protect persons or property. This applies only when the conduct is not criminal.

P. "**Personal watercraft**" means a conveyance, used or designed to be used on water that uses a jet pump powered by an internal combustion engine as the primary source of propulsion.

Q. "**Professional services**" means any type of service to the public that requires the person rendering the service to obtain:

1. An advanced degree; or

2. A license; or

CIC 00777 83 75 70U

3. Other legal authorization to provide the service.

R. "**Property damage**."

1. "**Property damage**" means physical damage to or destruction of tangible property including loss of use of this property.

2. For purposes of this policy, electronic data is not tangible property. Electronic data means information, facts or programs:

   a. Stored as or on;

   b. Created or used on; or

   c. Transmitted to or from;

   computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

S. "**Retained limit**" means the required minimum limit of liability for the applicable personal lines insurance coverage shown in the Schedule of Underlying Insurance on the Declarations. Where **underlying insurance** is payable

for any one **occurrence** to which this policy also applies**,** the amount of the **retained limit** will be either:

1. The split Bodily Injury/Property Damage limit shown in the Schedule, if **underlying insurance** has split limits; or

2. The Combined Single Limit shown in the Schedule, if **underlying insurance** has a combined single limit.

Where **underlying insurance** is not payable for any one **occurrence** to which this policy applies**,** the amount of the **retained limit** will be the split Bodily Injury/Property Damage limit shown in the Schedule.

T. "**Underlying insurance**" means the types of personal lines insurance coverages for which limits are shown in the Schedule of Underlying Insurance on the Declarations.

U. "**Watercraft**" means a conveyance principally designed to be propelled on or in water by wind, current, paddles, oars, engine power or electric motor.

---

## LIABILITY COVERAGES

---

INSURING AGREEMENT

A. <u>Damages.</u>

1. **We** will pay for damages, in excess of the **retained limit**, that an **insured** becomes legally obligated to pay because of **bodily injury** or **property damage** resulting from an **occurrence**.

2. **We** will pay for damages that an **insured** becomes legally obligated to pay because of **personal injury**.

B. <u>Defense.</u>

1. If a claim is made or a suit is brought against any **insured** for **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, or for **personal injury** to which this policy applies, **we** will provide a defense at **our** expense by counsel of **our** choice, even if the suit is groundless, false or fraudulent.

   However, **we** will not provide a defense:

   a. To any **insured** for criminal prosecution or proceedings; or

   b. If the **occurrence** or offense is covered by **underlying insurance** or any other liability insurance available to any **insured.**

CIC 00777 83 75 70U

2. **We** may investigate and settle any claim or suit that **we** decide is appropriate. **Our** duty to defend ends when the amount **we** pay to settle any claim, or in full or partial satisfaction of any judgment for damages resulting from the **occurrence** or offense, equals the Umbrella Liability Limit shown on the Declarations.

3. **We** have the right, but not the duty, to join with any **insured** or with the insurer providing **underlying insurance** in the investigation, defense or settlement of any claim or suit, or in any alternative dispute resolution process, which may require **us** to pay.

4. **We** may appeal a judgment in excess of the **retained limit** even if either the **insured** or the insurer providing the **underlying insurance** chooses not to appeal. If **we** do appeal, **we** will pay all related expenses.

## LIMIT OF LIABILITY

A. <u>Damages</u>.

1. **Our** maximum limit of liability under this policy for all damages resulting from any one **occurrence,** or any one offense listed as **personal injury**, is the Umbrella Liability Limit shown on the Declarations.

2. This Umbrella Liability Limit is the most **we** will pay regardless of the number of suits or size of awards made, and regardless of the number of **insureds**, claims made or persons injured.

B. <u>Defense.</u>  Defense costs are in addition to the Umbrella Liability Limit shown on the Declarations and include the following:

1. Premiums on appeal bonds and bonds to release attachments in any suit **we** defend.  But **we** will not pay the premium for bonds with a face value over the Umbrella Liability Limit shown on the Declarations.  **We** have the right, but not the duty, to either apply for or furnish any bond.

2. Expenses incurred by **us** or at **our** request on behalf of any **insured**, including court costs. **We** will pay interest on any part of a judgment covered by this policy.

3. Prejudgment interest awarded against any **insured** on that part of the judgment that is covered by this policy. If **we** make an offer to pay the applicable limit of liability available under this policy, **we** will not pay any prejudgment interest incurred or accrued after the offer is made.

4. Reasonable expenses incurred by any **insured** at **our** request, including actual loss of earnings (but not loss of other income) up to $250 per day for assisting **us** in the investigation or defense of a claim or suit.

## EXCLUSIONS

A. This insurance does not apply to:

1. Any loss assessments charged against any **insured** as a member of an association, corporation or community of property owners.

2. A nuclear energy **occurrence** that is covered by a nuclear energy liability policy, or would have been covered if the available liability insurance had not been used up.

3. Punitive or exemplary damages, fines or penalties.

CIC 00777 83 75 70U

B. This insurance does not apply to **bodily injury** to any person eligible to receive any benefits, whether voluntarily provided or required to be provided, by any **insured** under any:

1. Workers' Compensation law;

2. Non-occupational Disability law; or

3. Occupational Disease law.

C. This insurance does not apply to **property damage** to:

1. Property owned by any **insured**.

2. Any **aircraft** owned, hired, rented or used by, or in the care, custody or control of, any **insured**.

3. Property owned by others when any **insured** has physical control of such property, or has agreed to be responsible for or insure such property.

Paragraph 3. of this exclusion (C.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

D. This insurance does not apply to **personal injury** which results from a false statement if done by or at the direction of any **insured** with knowledge that the statement was false, or made with reckless disregard for the truth.

E. This insurance does not apply to **bodily injury** or **property damage**:

1. Caused by the intentional or purposeful acts of any **insured** that would be expected by any reasonable person to result in **bodily injury** or **property damage**. This applies even if the resulting **bodily injury** or **property damage**:

   a. Is of a different kind, quality or degree than initially expected or intended; or

   b. Is sustained by a different person, entity, real property or personal property than initially expected or intended.

This exclusion (E.1.) does not apply to **bodily injury** or **property damage** resulting from the use of lawful reasonable force by any **insured** to protect persons or property.

2. Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of or presence of any **fungus**, wet or dry rot, or bacteria.

This exclusion (E.2.) does not apply to any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for consumption.

3. Arising out of the use of any **motor vehicle** while that **motor vehicle** is being operated in, or in practice for, any **driving contest** or **challenge**.

F. This insurance does not apply to **bodily injury** or **personal injury**:

1. Sustained by any **insured**.

2. Arising out of illegal discrimination or violation of civil rights.

3. Arising out of any actual, alleged or threatened:

   a. Sexual misconduct;

   b. Sexual harassment;

   c. Sexual molestation; or

   d. Physical or mental abuse.

4. Arising out of the transmission of any communicable disease by any **insured**.

G. This insurance does not apply to **bodily injury, property damage** or **personal injury**:

1. Arising out of property any **insured** sells, gives away or abandons.

This exclusion (G.1.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

2. Arising out of:

CIC 00777 83 75 70U

a. The ownership, maintenance, use, loading or unloading of; or

b. The entrustment by any **insured** of; or

c. Vicarious liability, whether or not statutorily imposed, for the actions of anyone using;

a **motor vehicle, personal watercraft** or **watercraft**.

This exclusion (G.2.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

3. Arising out of:

a. The ownership, maintenance, use, loading or unloading of; or

b. The entrustment of any **insured** of; or

c. Vicarious liability, whether or not statutorily imposed, for the actions of anyone using;

an **aircraft** or **hovercraft**.

4. Arising out of the rental or holding for rental of any part of any premises, including any real property or real estate, by any **insured**.

This exclusion (G.4.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

5. Arising out of any **business** or **business property** of any **insured**.

This exclusion (G.5.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

6. Arising out of the rendering of or failure to render **professional services**.

7. Arising out of a criminal act or omission by, or with either the knowledge or consent of, any **insured**.

8. Arising directly or indirectly out of, or conduct resulting in: war including undeclared war; civil war; insurrection; rebellion; revolution; warlike act by a military force or military personnel; or destruction or seizure or use for a military purpose. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

9. Arising out of any **insured's** activities as an officer or member of a board of directors of any organization.

This exclusion (G.9.) does not apply to non-profit religious, charitable or civic organizations when:

a. The activity is not connected with any **insured's business**; and

b. The **insured** is not compensated for the activity other than reimbursement of out-of-pocket expenses.

10. Arising out of any contract or agreement.

This exclusion (G.10) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

11. Arising out of the actual, alleged or threatened discharge, dispersal, release, escape, seepage or migration of pollutants however caused and whenever occurring. This includes any loss, cost or expense arising out of any:

a. Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

CIC 00777 83 75 70U

b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants, as used in this exclusion (G.11.) means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials which are to be recycled, reconditioned or reclaimed.

12 Arising out of exposure to lead paint or other lead-based products.

13 Arising out of exposure to asbestos.

14 Arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a controlled substance(s). Controlled substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs.

This exclusion (G.14.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

---

## CONDITIONS

A. <u>Bankruptcy.</u> Bankruptcy or insolvency of any **insured** will not relieve **us** of **our** obligations under this policy.

B. <u>Concealment, Misrepresentation or Fraud.</u>

1. If **you** or any other **insured**, whether before or after an **occurrence** or offense to which this policy applies, has done any of the following related to the issuance of this policy or in the presentation of a claim, **we** may deny coverage as to the interest of all **insureds**:

   a. Intentionally concealed or misrepresented any material fact or circumstance.

   b. Engaged in fraudulent conduct.

   c. Made false statements which if known by **us** would have caused **us** not to:

      (1) Issue the policy;

      (2) Issue the policy in as large an amount;

      (3) Provide coverage for the hazard resulting in the loss; or

      (4) Issue the policy for the same amount of premium or at the same rate.

2. **We** reserve all rights to seek recovery from any person committing concealment, misrepresentation or fraud for all payments made and costs incurred.

C. <u>Duties After an **Occurrence** or Offense.</u> **We** will not be required to provide coverage under this policy unless there has been full compliance with these duties. In case of an **occurrence** or offense, **you** or **your** representative will perform the following duties that apply:

1. Give written notice to **us** or **our** agent as soon as is practical, which sets forth:

   a. The identity of the named insured shown on the Declarations;

   b. Reasonably available information about the time, place and circumstances of the **occurrence** or offense; and

   c. Names and addresses of any claimants and witnesses.

CIC 00777 83 75 70U

2. Cooperate with **us** in the investigation, settlement or defense of any claim or suit.

3. Promptly forward to **us** every notice, demand, summons or other process relating to the **occurrence** or offense.

4. At **our** request, help **us**:

   a. Make settlement;

   b. Enforce any right of contribution or indemnity against any person or organization who may be liable to any **insured**;

   c. With the conduct of suits and attend hearings and trials; and

   d. Secure and give evidence and obtain the attendance of witnesses.

5. For **property damage** losses, if **we** request, submit to **us** within 60 days after notice of loss a statement of loss and show the damaged property if in the control of any **insured**.

6. No **insured** will, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

D. Other Insurance. The coverage afforded by this policy is excess over any other insurance available to an **insured**, except insurance written specifically to be excess over this policy.

E. **Our** Right to Recover Payment.

1. If **we** make a payment under this policy, **we** are entitled, but not required, to exercise the **insured's** rights of recovery against any person or other entity liable for the **occurrence** or offense.

2. **We** can join with any **insured** and any insurer providing **underlying insurance** in the exercise of these rights.

3. The **insured** must do whatever is necessary to enable **us** to exercise these rights, and shall do nothing after

an **occurrence** or offense to prejudice or defeat them.

F. Ownership. For purposes of this policy, a vehicle is deemed to be owned by a person if leased under a written agreement to that person for a continuous period of at least six months.

G. Required **Underlying Insurance**.

1. If **underlying insurance** for **bodily injury** or **property damage** has terminated, is uncollectible, or has a limit less than the **retained limit**, this will not void coverage. However, **we** will pay for **bodily injury** or **property damage** only as though the **underlying insurance** was collectible and in force in the amount of the **retained limit**.

2. **We** will not pay the difference between the **retained limit** and any lower limit actually in effect.

H. Spouse Access.

1. The named insured and **we** agree that the named insured and resident spouse are "customers" for purposes of state and federal privacy laws. The resident spouse will have access to the same information available to the named insured and may initiate the same transactions as the named insured.

2. The named insured may notify **us** that he/she no longer agrees that the resident spouse shall be treated as a "customer" for purposes of state and federal privacy laws, and **we** will not permit the resident spouse to access policy information.

I. Suit Against **Us**.

1. No action can be brought against **us**:

   a. Unless there has been full compliance with the policy provisions; and

   b. Until the obligation of the **insured** has been determined by final judgment or by agreement signed by **us**.

CIC 00777 83 75 70U

2. No person or organization has any right under this policy to join **us** as a party to any legal action against any **insured**.

J. Termination.

   1. Cancellation.

     a. **You** may cancel this policy at any time. However, the effective date of the cancellation cannot be earlier than the date of **your** request unless **we** agree to an earlier date.

     b. **We** may cancel this policy by sending an electronic notice, where allowed by law, to the named insured shown on the Declarations, or at **our** sole option, **we** may cancel by sending notice to the named insured by regular mail to the most recent address **you** provided to **us**. In either event, notice will be sent:

       (1) At least 10 days before the effective date of cancellation if cancellation is for nonpayment of premium; or

       (2) At least 30 days before the effective date of cancellation in all other cases.

   2. Nonrenewal. If **we** decide not to renew this policy, **we** will send electronic notice, where allowed by law, to the named insured shown on the Declarations, or, at **our** sole option, **we** may send the named insured notice by regular mail to the most recent address **you** provided to **us**. In either event, notice will be sent at least 30 days before the end of the policy period.

   3. Other Termination Provisions.

     a. Proof of mailing or electronic transmission of any notice will be sufficient proof of notice.

     b. If this policy is cancelled, the named insured may be entitled to a premium refund. The premium refund, if any, will be computed according to **our** manuals. However, making or offering to make the refund is not a condition of cancellation.

     c. The effective date of cancellation stated in the notice will become the end of the policy period.

K. Transfer of **Your** Interest in This Policy.

   **Your** rights and duties under this policy may not be assigned without **our** written consent. However, if the named insured shown on the Declarations dies, **we** will provide coverage until the end of the policy period for:

   1. The surviving spouse if resident in the same household at the time of death. Coverage applies to the spouse as if a named insured shown on the Declarations;

   2. Any **family member** who is an **insured** at the time of **your** death, but only while a resident of **your** household; and

   3. The legal representative of the deceased named insured, but only with respect to **occurrences** covered by this policy and for which the deceased named insured would have been liable.

L. Waiver or Change of Policy Provisions. This policy contains all the agreements between **you** and **us**. Its provisions may not be changed or waived except by endorsement issued by **us**. If a change requires a premium adjustment, **we** will adjust the premium as of the effective date of the change.

Copyright. USAA. 2009. All rights reserved
Includes copyrighted material of Insurance Services Office Inc., with its permission.

CIC 00777 83 75 70U

## ARIZONA SPECIAL PROVISIONS

This Endorsement forms a part of the Umbrella policy to which it is attached, and the provisions of the Umbrella policy and any Endorsements apply to this coverage unless modified by this Endorsement.

## CONDITIONS

Condition J., <u>Termination</u>, is replaced in its entirety by the following:

J.   <u>Termination</u>.

1.   <u>Cancellation</u>.

   a.   **You** may cancel this policy at any time. However, the effective date of the cancellation cannot be earlier than the date of your request unless **we** agree to an earlier date.

   b.   **We** may cancel this policy by sending notice to the named insured by regular mail to the most recent address **you** provided to **us.** Notice will be sent:

      (1) At least 10 days before the effective date of cancellation if cancellation is for nonpayment of premium.

      (2) At least 30 days before the effective date of cancellation in all other cases.

   c.   If this policy has been in effect for 60 days or more, or if it is a renewal with **us**, **we** may cancel this policy only if one or more of the following happened after the effective date of this policy:

      (1) Nonpayment of premium.

      (2) Conviction of the **insured** of a crime arising out of acts increasing the hazard insured against.

      (3) Acts or omissions by the **insured** or his representative constituting fraud or material misrepresentation in obtaining this policy, continuing this policy, or in presenting a claim under this policy.

      (4) Discovery of grossly negligent acts or omissions by the insured substantially increasing any of the hazards insured against.

      (5) Substantial change in the risk assumed by **us**, since the policy was issued, except to the extent that **we** should reasonably have forseen the change or contemplated the risk in writing the contract.

      (6) A determination by the Director of Insurance that the continuation of this policy would place **us** in violation of the insurance laws of this state.

      (7) Failure of the **insured** to take reasonable steps to eliminate or reduce any conditions in or on an insured premises which contributed to a loss in the past or will increase the probability of future losses.

2.   <u>Nonrenewal</u>.

   a.   If **we** decide not to renew this policy, **we** will send notice to the named insured by regular mail to the most recent address **you** provided to **us.** Notice will be sent at least 30 days before the expiration date of the policy.

   b.   In the event of nonrenewal based on condition of the premises, the insured shall be given 30 days notice to remedy the identified conditions. In the event that the identified conditions are not satisfactorily remedied, the insured shall be given an additional 30 days, upon payment of premium, to cure the defective condition.

CIC 00777 83 75 70U

3. <u>Other Termination Provisions</u>.

   a. Any **insured** who believes:

      (1) Cancellation or nonrenewal of this policy is arbitrary or capricious; or

      (2) Notice of nonrenewal or cancellation was not given as required by A.R.S. 20-1632 ;

   may, within ten days after receipt of notice, file in writing an objection to the action with the Director of insurance, in accordance with A.R.S. 20-1633.

   b. Proof of mailing of any notice will be sufficient proof of notice.

   c. If this policy is cancelled, the named insured may be entitled to a premium refund. The premium refund, if any, will be computed according to **our** manuals. However, making or offering to make the refund is not a condition of cancellation.

   d. The effective date of cancellation stated in the notice will become the end of the policy period.

Copyright. USAA. 2009. All rights reserved.
Includes copyrighted material of Insurance Services Office. Inc., with its permission.

CIC 00777 83 75 70U

## CHANGES ENDORSEMENT

This Endorsement forms a part of the Umbrella policy to which it is attached.  It is subject to all the provisions of the policy and amendments except as they are modified in this Endorsement.

The Conditions section is amended to add the following:

### CHANGES

A.  The premium is based on information **we** have received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete. **You** agree that if this information changes, or is incorrect or incomplete, **we** may adjust **your** premiums accordingly during the policy period.

B.  If, during the policy period, the risk exposure changes for any of the following reasons, **we** will make the necessary premium adjustments effective the date of change in exposure. **We** will send a modified Declarations page showing the change in exposure and premium adjustment. Change in exposure means the occurrence of an event listed in B.1. through B.6. or a similar event that may increase or decrease the policy premium. **You** agree to give **us** notice of any exposure change as soon as is reasonably possible. Changes that may result in a premium adjustment include, but are not limited to, the following:

1.  Replacement, addition, deletion, change in description or change in usage of any **motor vehicle**.

2.  Addition or deletion of any operator.

3.  Replacement, addition, deletion or change in description or change in usage of any premises, including any real property or real estate.

4.  Replacement, addition, deletion, change in description or change in usage of any **watercraft** or **personal watercraft**.

5.  Addition or deletion of any **underlying insurance**.

6.  Increase or decrease in the limit of liability for any **underlying insurance**.

Copyright, USAA, 2010. All rights reserved.
Includes copyrighted material of Insurance Services Office, used with permission.

USAA Casualty Insurance Company
9800 Fredericksburg Road
San Antonio, Texas 78288

# ARIZONA SUMMARY OF RIGHTS

We're required by your state's insurance laws to provide you with the following information.

## Your Rights Following an Adverse Underwriting Decision

In the event of an adverse underwriting decision, we will provide you notice of the decision and you have the following rights.

You have 90 business days from the date of the mailing of the notice to request an explanation. We will respond to your request within 21 business days of receipt of your written request with the following information if it is not included in the original decision notice:

- The specific reason for the adverse underwriting decision; and

- The specific items of personal and privileged information that support those reasons, except that we may not disclose certain privileged information about you, nor will we disclose the specific items of medical record information supplied by a medical care institution or medical professional either directly to you or your designated medical professional.

We will disclose the names and addresses of the institutional sources that supplied the specific items of personal or privileged information, and we will only disclose any medical professional or medical care institution information directly to you or to your designated medical professional.

## Your Right to Access Your Recorded Personal Information

If we or an insurance support organization (ISO) make a record of your personal information, you have the right to submit a written request for access to your record. Within 30 business days of the receipt of your request for access to your recorded personal information, we or the ISO will inform you of the nature and substance of the recorded personal information, and the response will address the following:

- A description of your right to see and copy, in person, the personal information record, or obtain a copy by mail, whichever you prefer. We or the ISO will disclose to you the identity, if recorded, of those persons to whom we or the ISO have disclosed the personal information within two years prior to your request; if we or the ISO do not have the identity of the person, we will provide the names of those institutions or persons to whom the information is normally disclosed. We or the ISO will provide you with a summary of the procedures by which you may request that we correct, amend or delete your recorded personal information in our possession or in the possession of the ISO.

- We or the ISO will identify whether the source of any personal information is from an institutional source.

- If the information is a medical record supplied by a medical care institution or medical professional, we or the ISO will identify the medical professional or medical care institution which provided the information either directly to you or to a licensed medical professional designated by you. We will notify you if we elect to disclose the information to a medical professional designated by you.

## Your Right to Correct, Amend or Delete Recorded Personal Information

If we or the ISO possess any recorded personal information about you, you may send us or the ISO a request that we correct, amend or delete this recorded personal information. When we or the ISO receive your written request to correct, amend, or delete any personal information about you, we or the ISO will respond within 30 business days of the receipt of the written request. The response from us or the ISO will either:

- Show that we agree to correct, amend, or delete the portion of the recorded personal information in dispute; or

- Notify you of our refusal to make the correction, amendment, or deletion, explain the reasons for the refusal, and inform you of your right to file a statement if you disagree.

If we or the ISO correct, amend or delete your recorded personal information, we or the ISO will notify you in writing and furnish the correction, amendment, or fact of deletion to any person specifically designated by you who within the preceding two years may have received the recorded personal information.

If you disagree with our refusal or the ISO's refusal to correct, amend, or delete recorded personal information, you may file with us or the ISO a concise statement setting forth what you think is the correct, relevant, or fair information and a concise statement of the reasons why you disagree with the decision to refuse to correct, amend, or delete recorded personal information. Your response will be added to your file with us or if you are sending a response to the ISO, your response will be added to its file.

**How to Request Information from USAA**

Please send your written request to USAA at 9800 Fredericksburg Road, San Antonio, Texas 78288, Attention: P&C Underwriting.

**USAA®**

9800 Fredericksburg Road
San Antonio, Texas  78288

# NOTICE OF INFORMATION PRACTICES

This notice describes the information practices of the:
- United Services Automobile Association,
- USAA Casualty Insurance Company,
- USAA General Indemnity Company, and
- Garrison Property and Casualty Insurance Company.

These practices relate to the information we have about you. You may have also received our "Privacy Promise." However, the laws in your state require that we give you this notice.

## COLLECTION OF INFORMATION
We collect information about you, and the individuals you add on your policy, from various sources. This data may be gathered from you and other sources by telephone, in person, electronically, or by mail. Some examples are shown below:
- Information you provide on applications and other forms, such as name, address, and date of birth.
- Information about your transactions with us, or with other companies. This means, for example, a request for a new policy, a policy change, or a billing transaction.
- Information from consumer reporting agencies, such as a motor vehicle report.
- Data from research firms and other data providers.
- Information gathered during the process of handling insurance claims, including health information.
- Information from government agencies, such as accident or theft reports.

## SHARING OF INFORMATION AS PERMITTED BY LAW
We may need to share some information about our current or former customers outside of USAA to properly manage our business. This includes sharing to efficiently service your accounts, to comply with laws, and for other routine business practices. For example, we may share such information with:
- You, when handling your insurance transactions.
- Our affiliates.
- Businesses that provide information to us or assist us in settling claims. This may involve other insurers, medical care institutions or professionals, or repair shops.
- Regulatory, law enforcement, or other government agencies.
- Those who provide a business service or help us with an insurance function, such as printers, mail houses, appraisers, or insurance support organizations.
- Those who assist us in detecting or preventing criminal activity, fraud, material misrepresentation, or material nondisclosure in connection with an insurance transaction.
- Those who serve us with a facially valid administrative or judicial order, including a search warrant or subpoena.
- Those who conduct actuarial or research studies.

## IMPORTANT PRIVACY CHOICES
USAA provides two privacy opt out choices: (1) limit the information USAA uses for marketing and (2) limit the flow of information within USAA. You may opt out online by updating your Privacy Preferences at usaa.com/optout, or by calling us at (800) 531-7154. Opting out will make it difficult for us to serve you as you might expect. If you opt out:

- We may need you to repeat information that you have already provided and we may not be able to pre-fill applications for you.
- We may have to transfer your phone calls more often.
- We may not have information that allows us to offer you the products that best meet your needs.

**AUTHORIZATION TO SHARE**

We honor any additional rights you may have under state laws. By not opting out, you authorize us to use and share your information within USAA.

**SECURITY AND CONFIDENTIALITY PRACTICES**

USAA protects the information we collect. Access to this information is limited to those persons who must have it to do their jobs. We also have:
- Physical security at our buildings.
- Password protected databases and virus/intrusion detection software.
- Privacy compliance audits.

**REVIEWING AND CORRECTING PERSONAL INFORMATION**

You may review our files of personal information about you. You may do this in person or request a copy. We are not required to provide information that relates to any claim, whether paid or not, or when the possibility of a lawsuit exists.

The review request must:
- Be in writing.
- Specify the type of personal information you wish to review.
- Include your name, address, and policy number.
- Be mailed to: USAA, 9800 Fredericksburg Road, San Antonio, Texas 78288-0342.

After we receive your request, we will:
- Inform you of the nature of the information we have.
- Confirm if the data you are requesting is available.
- Advise you of processing and copy fees. These fees are due before we provide any copies you request.

If you request medical information supplied by a medical care institution or professional, we will tell you the source of the information. Some states do not allow us to release all or certain information directly to you. If your state allows us to release information directly to you, we will do so upon receiving your formal request. We can also release your information to the licensed medical professional you designate upon receiving your formal request.

You may also request that we correct, amend, or delete incorrect personal information we have about you. This request must:
- Be made to us in writing.
- Be made separate from a review request.
- Explain what you believe is incorrect and why.
- Be mailed to the address given above.

**INFORMATION FOR INTERNET USERS**

USAA uses Internet cookies and related technology for your security, to manage our site and to provide more relevant offers. Visit our Security Center at USAA.COM to learn more.

USAA collects personal information on USAA websites, web pages and "apps", as well as public information posted on social media, for site management, security, business and marketing purposes.  Examples of information we may collect include: previous URL you visited, transaction information you submit, and clicks on USAA ads and related pages.

**INSURANCE SUPPORT ORGANIZATIONS AND THE INFORMATION RETAINED**

Insurance support organizations may keep information they give us. These firms may share that information with other persons as permitted by law.

# EXHIBIT C

1   Tamany J. Vinson Bentz (CA SBN 258600)
    tamany.bentz@us.dlapiper.com
2   Jonathan D. Kintzele (CA SBN 316482)
    jonathan.kintzele@us.dlapiper.com
3   **DLA PIPER LLP**
    2000 Avenue of the Stars
4   Suite 400 North Tower
    Los Angeles, California 90067-4704
5   Tel: 310.595.3022
    Fax: 310.595.3300
6
    Attorneys for Plaintiff
7   BREAKING CODE SILENCE,
    a California 501(c)(3) nonprofit
8

9             **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11

12   BREAKING CODE SILENCE, a     **CASE NO. 2:22-cv-002052**
    California 501(c)(3) nonprofit,
13                       **COMPLAINT FOR DAMAGES:**
          Plaintiff,
14                       1. **Computer Fraud and Abuse Act,**
        v.                     **18 U.S.C. § 1030,** *et seq.***;**
15
16                       2. **California's Computer Data**
    KATHERINE MCNAMARA, an        **Access and Fraud Act, Cal. Penal**
17   individual, JEREMY WHITELEY     **Code § 502,** *et seq.*
    an individual, and DOES 1 through 50,
18   inclusive,
19           Defendants.        **DEMAND FOR JURY TRIAL**
20
21
22
23
24
25
26
27
28

                      COMPLAINT FOR DAMAGES

<strong><u>COMPLAINT</u></strong>

Plaintiff Breaking Code Silence ("BCS"), by and through its undersigned attorneys, brings this suit against Defendants Katherine McNamara and Jeremy Whiteley and alleges as follows:

<strong><u>INTRODUCTION</u></strong>

1.      BCS is a California 501(c)(3) nonprofit organization that represents children, youth, and adults who are/were incarcerated in the U.S. troubled teen industry ("TTI"), a network of privately-owned, powerfully punitive, and often wilderness-based therapy programs, residential treatment centers, therapeutic boarding schools, group homes, boot camps, and faith-based academies.

2.      Breaking Code Silence intends to be a vehicle for the TTI-survivor community–ever striving to uplift, organize, and inspire present and future generations, while promoting youth rights and evidence-based alternatives to the troubled teen industry.  BCS cannot do any of these things for the TTI victims or survivors if it cannot communicate with the community and the people, like attorneys, who share in BCS's mission of ending TTI abuses.

3.      Unfortunately, Defendants Katherine McNamara and Jeremy Whiteley, both former BCS board members, are attempting to silence BCS and prevent BCS from communicating with the TTI-survivor community.  In particular, Defendant Katherine McNamara has exhibited a pattern and practice of maliciously accessing materials, social media accounts, third party platform accounts, and a website all belonging to BCS in an attempt to shut down BCS.

4.      This conduct has left BCS with no other choice but to bring this complaint for damages and injunctive relief.

<strong><u>JURISDICTION AND VENUE</u></strong>

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a) as those claims are so related

to Plaintiff's federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.     This Court has personal jurisdiction over Defendant McNamara because, on information and belief, McNamara is a resident of California, and this lawsuit arises out of McNamara's purposeful and unlawful conduct occurring within the State of California and in this District.

7.     This Court has personal jurisdiction over Defendant Whiteley because this lawsuit arises out of Whiteley's purposeful and unlawful conduct knowingly directed to BCS within the State of California and in this District.  Specifically, this Court has jurisdiction over Whiteley, because, on information and belief, Whiteley, *inter alia*, has engaged in acts of cyber hacking directed to BCS in California and in this District, including but not limited to the unauthorized accessing of servers and networks that, upon information and belief, are located in the County of Los Angeles, and purposefully directed his activities at residents of California and this District. As such, Whiteley's conduct has established that he would reasonably and fairly anticipate being called into court in this District.

8.     Venue is further proper in this District under 28 U.S.C. § 1391(b)(2) because the acts, liabilities, and events claimed in this action arose in and were directed at Plaintiff within this District, in Los Angeles County. Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant McNamara resides in this district.

## THE PARTIES

9.     Plaintiff Breaking Code Silence is, and at all times relevant herein was, a 501(c)(3) nonprofit organization formed and existing under the laws of the State of California and having a principal place of business at 1005 E. Las Tunas Dr., #104, San Gabriel, California 91776.  BCS was founded in California by six women in 2019, including Defendant Katherine McNamara, and incorporated as a

501(c)(3) nonprofit with the California Secretary of State on March 22, 2021.

10.    Defendant McNamara is, and at all times relevant herein was, a U.S. citizen domiciled in California.  Defendant McNamara served as a board member and BCS's IT person, which aligned with her professional skills and experience as a cybersecurity systems engineer.  Defendant McNamara managed many of BCS's accounts because she helped the organization set up its information technology accounts and maintained the administrative privileges to those accounts.  Defendant McNamara voluntarily terminated her relationship with BCS on or around December 9, 2021, after a dispute regarding the direction and professionalism of the organization and concerns over Defendant McNamara's behavior in the survivor community.  Defendant McNamara formally resigned, and on information and belief, she is currently operating an identical organization known as Unsilenced. Unsilenced has and continues to use many of the materials developed and written by BCS's employees and volunteers, an issue that BCS was trying to work out amicably with UnSilenced despite ongoing attacks by Defendant McNamara that maliciously targeted online platforms that are critical components of BCS's means of communicating with the TTI-survivor and victim community.  However, Defendant McNamara's escalation of these attacks to target the BCS Website has proven continued discussions would be futile.

11.    Defendant Whiteley is, and at all times relevant herein was, a U.S. citizen domiciled in Arizona.  Defendant Whiteley was also a former BCS board member.  He joined the BCS board on or around March 22, 2021 and voluntarily terminated his relationship with BCS on or around June 28, 2021.  Mr. Whiteley, in partnership with Ms. McNamara, originally set-up the website infrastructure for BCS to use with its domains. He also set up the hosting account for the BCS website through Cloudways, which he returned to the organization after resigning per the agreement established with all board members.

12. BCS does not know the true names or capacities, whether individual, partner or corporate, of the defendants sued herein as DOES 1 through 50, inclusive, and for that reason, said defendants are sued under such fictitious names, and BCS will seek leave to amend this complaint, if necessary, when true names and capacities are known. BCS is informed and believes and based thereon alleges that each of said fictitious defendants was responsible in some way for the matters alleged herein and proximately caused BCS and members of the general public to be subject to the illegal actions, wrongs, and injuries complained of herein.

13. Upon information and belief, each of the Defendants was the agent, principal, employee, representative, or alter ego of the other Defendants and/or acted with one or more of the other Defendants' knowledge, consent and approval, and acted within the course and scope of their agency or representative capacity. As such, each of the Defendants is responsible for the actions of the other Defendants, as alleged herein.

14. Upon information and belief, at all times pertinent hereto, each of the Defendants was an aider, abettor, or co-conspirator of each of the other Defendants. Each of the Defendants acted within the course and scope of such conspiracy or in the course and scope of a common plan and scheme described below; and each of the Defendants was in some manner responsible for the acts and omissions alleged in these causes of action. Upon information and belief, each of the Defendants has ratified and/or approved each of the acts and omissions of each of the other Defendants.

15. Upon information and belief, in taking the actions described in this complaint, Defendants acted intentionally, in concert, and pursuant to an agreement between and among them, the purpose of which was to obtain and convert secret, confidential, and proprietary information, documents, data, work product, business opportunities, business relationships, and other property belonging to BCS, to use

such property for their own benefit and for their own competitive advantage, and to deprive BCS of the use of such property in its business.  Upon information and belief, each of these Defendants knew of and agreed to both the objective and course of action to deprive BCS of such property and to cause injury to BCS.  The wrongful acts and damage caused to BCS as a result of Defendants' conduct are set forth in detail below.

## **FACTUAL BACKGROUND**

16.     Six women, including Defendant McNamara, founded BCS. Plaintiff's mission is to prevent institutional child abuse and empower survivors to promote positive social change through self-advocacy.  Accomplishing this mission depends principally on BCS's ability to contact, engage, and mobilize the survivor community by using its company assets, including its contact and donor lists, and repository of confidential client information contained in BCS's databases.

17.     In 2019, the founding members of BCS started setting up various social media accounts and registered the domain name <breakingcodesilence.net>. At all times this work was done on behalf of BCS and not for the individuals' benefit.  This work continued on behalf of the organization into 2020, at which time Defendant McNamara registered the domain <breakingcodesilence.org> for the organization.

18.     Defendant McNamara was requested to secure the registration of the <.org> domain, and she acquired and paid for the domain on March 11, 2020. In March 2021, BCS launched the URL <breakingcodesilence.org>  to correspond with the signing of Utah SB 127, which was based on the model legislation created while participating in the RISE Justice Labs program. Another founding board member secured and paid for hosting services for the website in March 2021.

19.     Communicating via its website and social media accounts is critical to BCS's ability to serve its community.  BCS's charitable operations are virtually all

online, including, but not limited to, advertising, communications, marketing, and donation transactions, are conducted exclusively online using a variety of software programs and social media accounts, including, but not limited to, Google, which hosts the email address info@breakingcodesilence.org; Google/Adwords; PayPal; Zotero; Hootsuite; Twitter; TikTok; Youtube; Instagram/Facebook; Slack; and the use of BCS's compiled mailing lists of just under 1,000 individuals.

20. In September 2020, the six original founders of BCS jointly filed for a federal trademark registration for BREAKING CODE SILENCE. This application has not been granted and, since the original filing, some of the original founders have filed competing applications, none of which have been granted.

21. On March 22, 2021, BCS was formally incorporated as a 501(c)(3) nonprofit organization in California.

22. On April 6, 2021, Josh Scarpuzzi, creator of the memoir book *Breaking Code Silence* and owner of the domain <breakingcodesilence.com> and the breakingcodesilence Facebook page, assigned his rights to the domain name and Facebook page to BCS.

23. A few months after BCS was incorporated, Defendant McNamara submitted reimbursement requests for several items, including certain costs associated with the <breakingcodesilence.org> domain and email accounts. By submitting her costs for reimbursement, she reiterated that these accounts were not her personal assets but instead for the benefit of BCS. BCS for its part agreed to reimburse Defendant McNamara when it was "fully funded." This was the same agreement finalized with each of the three other board members who provided funds toward the organization's initial establishment and growth, none of whom have been reimbursed yet, as the organization is not fully funded.

24. In addition to the domain name and social media accounts, it was BCS's understanding that it owned any and all credentials, passwords, and login

information for the same properties, and any and all credentials, passwords, and login information associated with its free access, use, and control of its website, online platforms, and social media accounts.

### *Defendant Whiteley Resigns From BCS*

25.     In June 2021, Defendant Whiteley voluntarily resigned from BCS's board of directors.

26.     Within weeks, Defendant McNamara (who was still on the BCS board) demanded that Defendant Whiteley turn over any administration credentials or information he had relating to BCS's domain and social media accounts. Specifically, Defendant McNamara stated, in writing, that any accounts Defendant Whiteley had created for BCS's use were for the benefit of BCS and belonged to BCS.

### *Defendant McNamara Resigns From BCS*

27.     Beginning in the fall of 2021, Defendant McNamara started creating tension on BCS's board and began regularly spreading gossip and slanderous lies about fellow board members among volunteers and in the survivor community. The parties engaged in a conflict resolution process with a consultant.  The conflict resolution process was unsuccessful in large part because Defendant McNamara would not accept the consultant's proposal that she step down from the board.

28.     On December 9, 2021, Defendant McNamara voluntarily resigned from BCS's board.

29.     However, after resigning from BCS's board, Defendant McNamara continued to undermine BCS's mission to assist the TTI-survivor and victim community.

30.     On or around December 10, 2021, McNamara conspired with other volunteers and employees of BCS, including Mary "Meg" Appelgate (neé Gochnauer) and Caroline (Cole) Lorson, to download BCS's files and confidential

data, including an entire Google Drive, without BCS's authority or permission, and in specific instances, even tamper with, destroy, and deny access to portions of BCS data from such Google Drive, including but not limited to the permanent theft of the entire Legislative Google Drive folder and all documents in its contents, the majority of which BCS did not and does not have copies of anymore.

31.     Other files stolen by McNamara, Appelgate, Cole, and others they coerced, many of which they also attempted to permanently delete, were inaccessible to BCS for up to 25 days before BCS personnel were successfully able to manually override the deletion request and recover the data.

32.     Once Defendant McNamara was satisfied that she had gutted the entirety of BCS's electronically stored information, she encouraged additional volunteers and board members to leave BCS under false pretenses.

### Defendants Form Unsilenced and Begin Withholding Access to BCS Accounts

33.     Sometime after December 2021, Defendant McNamara and former BCS volunteers, formed UnSilenced, a nonprofit corporation that purports to serve the same survivor community as BCS, and seeks to achieve the identical objectives as BCS.  It is clear that stealing BCS's electronic materials was intended to allow Defendant McNamara to avoid the cost, time, and risk of building a competing nonprofit from scratch and to appropriate the years of goodwill built by the BCS name and brand.

34.     Defendant McNamara also started accessing BCS's critical social media accounts without authorization and changing passwords so BCS can no longer control the accounts.  For instance, on January 9, 2022, upon information and belief, Defendant McNamara maliciously gained access to @BreakingCodeSi1, the Twitter account used by BCS to communicate with survivors, victims currently suffering from abuse, and attorneys and other advocates trying to help victims. Upon information and belief, Defendant McNamara changed the name of the

Twitter account to "Go-ACCA" before deleting the account in its entirety. She then secured a new Twitter account under the now available handle "breakingcodesi1" and described it as "Just Another Twitter Account". Defendant McNamara's actions denied BCS not only access to the account but also the benefit of years of connections and communications with the community.

35. Defendant McNamara also refused to return her administrative credentials to BCS's YouTube channel and actively denied them access to the account. While Defendant McNamara represented to BCS that she did not have administrative privileges on this account, the administrative information available from YouTube listed Defendant McNamara as the "Primary Account Owner" of the BCS YouTube account. The account was also registered to her personal email address "iristheangel@gmail.com." Defendant McNamara finally returned only this one account to BCS, but only after multiple requests by BCS. On or around January 9, 2021, and again on January 28, 2021 BCS requested that Defendant McNamara return their administrative credentials for the BCS TikTok account. Defendant McNamara represented to BCS that she had no control over the account because it belongs to BCS and was registered to Defendant McNamara's BCS email account ("kmcnamara@breakingcodesilence.org"). Defendant McNamara's representation was again false, as the TikTok account is not registered to her BCS email account, but on information and belief, Defendant McNamara maintains control over BCS's TikTok account and freely has access to its followers under the guise that UnSilenced is related to BCS.

### *Defendants Escalate McNamara's Conduct and Hack Into BCS's Website*

36. On or around March 10, 2022, using Defendant Whiteley's former administrative credentials, both Defendants exercised an extreme act and maliciously accessed BCS's account with Google via the Google Search Console and possibly the back end of BCS's Website (which includes both the

www.breakingcodesilence.org and www.breakingcodesilence.com domains) without permission or authorization from BCS and caused the website to be deindexed on Google. The effect of being deindexed is that no one could find BCS's Website on the largest search engine.[1]

37.     The timing of the deindexing was critical. Earlier that day BCS had been featured on the TV show *The Doctors* and expected a rise in website traffic. In addition, around this same time, Lifetime was promoting a made-for-TV film based on the true stories of two TTI survivors, which was scheduled to debut on March 12 and highlighted BCS's work on the TTI-survivor and victim communities. Defendants' conduct prevented BCS from being able to promote the documentary, as Lifetime expected, and blocked the distribution of its message to people who viewed the documentary and tried to look up their website.

38.     From the date of Defendants' deindexing, Google Analytics reports for the website reflect a significant and dramatic drop in traffic. The deindexing of the BCS website blocked its primary and largest source of traffic, organic searches, cutting off the website's main source of exposure. For example, as a result of the deindexing requests from Defendants, the Google Search Console for the BCS website shows zero user traffic for the dates of March 10 and March 11, 2022, the same or nearly the same days of the *The Doctors'* feature piece and right before the Lifetime documentary promoting BCS to nation-wide audiences. On information and belief, these temporary deindexing requests last up to 6 months.

39.     Concurrently with successfully deindexing the BCS website, Defendants repeatedly, relentlessly, and maliciously attempted to remove and/or gain control of the BCS Website and corresponding Google Webmaster Central permissions on the day of the March 12, 2022, Lifetime documentary premiere.

---

[1] BCS only knew its website had been deindexed by accident. One of its current board members was making changes to the site and wanted to see how the changes were reflected in a Google search. When she searched, she could not find the site.

40.     BCS immediately engaged forensic data privacy experts to look into these issues.  These experts found a malicious tag attached to the BCS website, which allowed Defendants to wrongfully claim ownership of the site and deindex it. These experts were able to gain access to Google Search Console and could see three requests to deindex the website had been made – two on March 8 and one on March 9.

41.     The experts then accessed the website's WordPress account to manage the administrative privileges and were able to remove the tag, but they noticed a deeper problem. There was a malicious TXT record on the DNS entry that was controlled by Defendant McNamara.  This prevents BCS from being able to permanently stop the intrusion to its Google account.

42.     After a few days of this, Defendant McNamara escalated yet again and began alternating between requesting that Defendant Whiteley be given administrative privileges using a <medtexter.com> email account and then requesting that access be granted to two <Whitehouse.gov> email accounts: president@whitehouse.gov and comments@whitehouse.gov. The forensic experts conveyed concerns that, given Defendant McNamara's information security expertise, including accounts belonging to the federal government was an indicator that she was intentionally attempting to sabotage the account.  The experts further realized that removing the malicious tag was not enough to prevent the hacking – Defendants actually maintained administrative privileges to the site and were possibly accessing the back-end of the site without BCS's knowledge or permission.

43.     In addition to Defendants' causing the BCS website to be deindexed, they have attempted or succeeded at changing the content of the website. They also have the capacity to change the Google AdWords associated with the account, as shown by the Defendants' previous engagement in hacking actions and by, but not

limited to, Defendant McNamara's unauthorized access of the BCS AdWords account in January 2021.

44.     There is no means by which BCS can prevent Defendants from accessing and controlling their website.  Given Defendant McNamara's erratic and escalating harassment of BCS and attempts to interrupt its ability to service the TTI-survivor and victim community, BCS is concerned it will suffer further damage without injunctive relief from the Court.

45.     In some cases, the harm caused by Defendants is irreparable, e.g., the breach of the trust of the public sought to be served by BCS, the unknown extent to which they have reviewed and destroyed BCS confidential information, emails, intellectual properties, and other files, and damaged relationships after Defendant McNamara and her colleagues at UnSilenced made defamatory statements to valued partners, resulting in strained and, in some cases, terminated valued relationships.  In this lawsuit, BCS seeks an injunction to regain control of its digital assets and properties, as well as to recover damages, including statutory damages and penalties, resulting from Defendants' intentional, wrongful, and unlawful conduct.

46.     BCS's ability to communicate with, educate, and convey information to the survivor community is the lifeblood of the organization's operations and its service to the public.  Preventing BCS from being able to do so poses a severe and malicious threat to public health and well-being, particularly to the uniquely vulnerable persons that BCS was formed to serve and help where no other such organization existed. Defendants have acted intentionally, and with wanton and reckless disregard for the members of the public that their conduct has and continues to harm, by commandeering BCS's communications tools and ability to convey information across all of its core online channels.

47.     As a direct and proximate result of Defendants' wrongful conduct, BCS has suffered extensive damages in excess of $5,000 and in an amount to be proven at trial.  Such damages include the expenses associated with investigating Defendants' wrongful conduct and engaging forensic experts, lost business opportunities and monetary donations, and disclosure of misleading information to the public.

48.     BCS also seeks recovery for lost goodwill as a result of Defendant's dissemination of false information by impersonating BCS. Defendants have also greatly and unjustly enriched themselves using BCS's social media accounts and proprietary information at BCS's expense.

49.     BCS demands immediate injunctive relief requiring Defendants to immediately return all BCS credentials, passwords, and login information, as well as any and all of BCS's proprietary information in Defendants' possession, custody, and control.

50.     BCS further demands the right to inspect McNamara's personal computer and cloud based personal accounts to determine with whom and to what extent she has shared BCS's proprietary and sensitive information.

### FIRST CAUSE OF ACTION
**Violation of the Computer Fraud & Abuse Act (18 U.S.C. § 1030 et seq.)**
**(Against All Defendants)**

51.     BCS incorporates the preceding allegations as if fully set forth herein.

52.     At all relevant times herein, BCS's computer system or systems constituted a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used in or affecting interstate or foreign commerce or communication, and each company that BCS has an account with, including but not limited to the Google accounts, BCS Website and social media accounts, maintains a network of computers and servers that store all information and data related to the

BCS account and allows BCS to engage in interstate and foreign commerce and communication.

53. At all relevant times herein, BCS maintained a policy, which prohibits, among other things, accessing data, a server, a network or an account for any purpose other than conducting approved BCS business; revealing BCS system passwords to others or allowing use of the individual's account by others; circumventing user authentication or security; providing information about, or lists of, BCS users to parties outside BCS; and effecting security breaches or disruptions of BCS system resources, including but not limited to accessing data of which the individual is not an intended recipient or logging into a server or account that the individual is not expressly authorized to access.

54. Through Defendant McNamara's pattern and practice of repeatedly denying to BCS, including its owners and personnel, access to BCS's accounts including, but not limited to: Slack; Google Drive; Hootsuite; Zotero; Twitter; TikTok; YouTube; Instagram/Facebook; and the BCS Website, she intentionally accessed and used protected computers without authorization, or in excess of its authority, in violation of 18 U.S.C. §§ 1030 (a)(2)(C) and 1030 (a)(5)(c).

55. Defendant McNamara also violated the CFAA by intentionally accessing a computer used for interstate commerce or communication without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a computer, including but not limited to, (1) accessing BCS's electronic systems and the information contained therein, including without limitation its proprietary, sensitive, and confidential information; and (3) accessing BCS's internet/intranet/extranet-related systems, including without limitation the social media accounts, Google accounts, and BCS Website.

56. Defendant Whiteley violated the CFAA by intentionally accessing a computer used for interstate commerce or communication without authorization or

by exceeding authorized access to such a computer, and by obtaining information from such a computer, including but not limited to, accessing BCS's Google accounts to cause the website to be deindexed.

57.     During the period between at least March 8, 2022 and today, access to BCS's Website, information, and data was interrupted by Defendants, and they have refused to return the company's access and control of its online properties back to BCS.

58.     During the period between December 2021 and today, access to BCS's social media accounts was interrupted by Defendant McNamara as she refused to return the company's access and control back to BCS.  All of these accounts are still inaccessible to BCS (other than the YouTube account that Ms. McNamara returned in February 2022).

59.     Defendants' continued interruption of service and ongoing denial of BCS's owners and personnel access to the BCS website and the social media accounts have caused and continue to cause damage to BCS, and has caused BCS to suffer losses in excess of $5,000, and Defendants did so by intentionally accessing and using protected computers to obtain information from a protected computer without authorization, or in excess of its authority, in violation of 18 U.S.C. §§ 1030 (a)(2)(c).

60.     BCS has suffered and will continue to suffer immediate and irreparable harm, including but not limited to impairment of data damage caused by Defendants' extended period of exclusive control over BCS's online accounts, investigation and recovery losses involved in hours of past and continued efforts to secure the restoration of BCS and its data and information, as well as the time and services expended to conduct damage assessments and use forensic experts to investigate Defendants' CFAA and CDFA violations, and interruption of services and losses resulting from the loss of control and deindexing of the BCS Website.

BCS will continue to suffer such harm until Defendants' access to its property, accounts, and networks are preliminarily and permanently enjoined, and BCS's full and unlimited access is restored.

61.　　As a proximate result of Defendants' conduct, BCS has suffered, and will continue to suffer, actual damages, and Defendants will be unjustly enriched, in amounts to be proven at trial.

62.　　The acts of Defendants were intentional, malicious, and in bad faith and have subjected and will continue to subject BCS to cruel and unjust hardship in conscious disregard of BCS's rights, so as to justify an award of exemplary and punitive damages.

## **SECOND CAUSE OF ACTION**
### **Violation of California Penal Code § 502**
**(Against All Defendants)**

63.　　BCS incorporates the preceding allegations as if fully set forth herein.

64.　　At all times relevant herein, BCS owned the computer systems, computer network, computer data, and computer security credentials and login information used without permission or authorization by Defendants in the course of the conduct at issue.

65.　　Defendants have violated California Penal Code § 502 by knowingly accessing, copying, using, making use of, interfering, and/or altering data belonging to BCS: (1) in and from the State of California; (2) in the home state of BCS; and upon information and belief (3) in the state in which the servers that provided the communication link between BCS and its social media accounts, Google accounts, and Website are located.

66.　　Through Defendant McNamara's pattern and practice of repeatedly denying BCS access to its accounts, including, but not limited to: Hootsuite; Twitter; TikTok; YouTube; Instagram/Facebook; Zotero; Slack; Google; and the BCS Website, as well as the continued denial to the owners and personnel of BCS,

she has intentionally accessed and used protected computers without permission to alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network belonging to or licensed to BCS in order to wrongfully control or obtain money, property, or data, in violation of California Penal Code §§ 502(c)(1).

67. Through Defendant McNamara's pattern and practice of repeatedly denying BCS access to its accounts after December 2021, including, but not limited to: Google; Hootsuite; Twitter; TikTok; YouTube; Instagram/Facebook; Zotero; Slack; and the BCS website, as well as the continued denial to the owners and personnel of BCS, she has intentionally accessed and used protected computers without permission to take, copy, or otherwise use any data, computer, computer system, or computer network of belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(2).

68. Defendants have intentionally accessed and used without permission to use or cause to be used computer services belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(3). Defendant McNamara violated California Penal Code §§ 502 (c)(3) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website. Defendant Whiteley violated California Penal Code §§ 502 (c)(3) when he accessed BCS's Website without permission and caused it to be deindexed.

69. Defendants have intentionally accessed and used protected computer services without permission to alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network which resides or exists internal or external to a computer, computer system, or computer network belonging to or licensed to BCS, in violation of California Penal Code §§ 502 (c)(4). Defendant McNamara violated California Penal Code §§ 502 (c)(4) when she accessed and altered BCS's social media accounts, other online accounts, and

the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(4) when he accessed BCS's Website without permission and caused it to be deindexed.

70.     Defendants have intentionally and without permission, disrupted or caused the disruption of computer services and/or denied or caused the denial of computer services to the authorized users of BCS's computer, computer systems, or computer networks, including the owners of BCS, in violation of California Penal Code §§ 502 (c)(5).  Defendant McNamara violated California Penal Code §§ 502 (c)(5) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(5) when he accessed BCS's Website without permission and caused it to be deindexed.

71.     Defendants have intentionally accessed a computer, computer system, or computer network of BCS, in violation of California Penal Code §§ 502 (c)(7).  Defendant McNamara violated California Penal Code §§ 502 (c)(7) when she accessed and altered BCS's social media accounts, other online accounts, and the BCS Website.  Defendant Whiteley violated California Penal Code §§ 502 (c)(7) when he accessed BCS's Website without permission and caused it to be deindexed.

72.     During the period between December 2021 and today, access to BCS's information and data by BCS and its owners was interrupted by Defendants as they refused to return the company property back to its owners.  By locking BCS out of its accounts and deindexing the BCS Website, Defendants created an interruption of service, preventing BCS from accessing or using the accounts as well as the data and information contained therein and blocking search traffic to its website.  Defendants' actions caused BCS's data and programs to be not readily obtainable to it, and Defendants continue to refuse to return such access to BCS.

73.     During this period of service interruption, BCS suffered losses of revenue and donations as well as costs incurred and other consequential damages as a result of Defendants' refusal to return the organization's control of its online properties. Lost revenues include unrealized revenues, such as those lost revenues BCS suffered beginning in March of 2022, because Defendants intentionally shut off all search traffic to BCS's website at the same time as BCS's multiple high-profile public relations and television events, as described herein.  Because BCS's website was deindexed, BCS could not interact with or reach its community, intake donor contributions through its online payment portals, generate new followers for its online accounts, or otherwise operate whatsoever, and as a result, BCS lost thousands of dollars in donations, revenues, and in potential future growth of the same due to the Defendants' unauthorized commandeering of BCS's network and computer service platforms.

74.     At all times relevant herein, BCS owned the computer systems, computer networks, and data at issue.

75.     Defendants' unauthorized access to BCS's computer systems and data was not carried out within the course and scope of their employment with BCS, and Defendants were not accessing the electronic files in order to perform acts that were reasonably necessary to their performance of work assignments for BCS.

76.     Defendants did the acts and things herein alleged pursuant to, and in furtherance of, the above alleged misconduct aimed at harming BCS and permanently damaging BCS's reputation and goodwill with the public, as well as with the intention of causing BCS monetary losses by way of this same conduct.

77.     Defendants' conduct was willful and malicious, performed with the intent to do harm.  Therefore, under Penal Code Section 502(e)(4), BCS is entitled to an award of punitive and exemplary damages.

78.     As outlined in the foregoing paragraphs, BCS has been damaged as a result of Defendants' violations of Section 502, in an amount to be proven at trial, including but not limited to the costs of the time and expense of recovering the company and determining the damage caused by Defendants.

79.     Defendants have been unjustly enriched as a result of their violations of Section 502, in an amount to be proven at trial.

80.     Under Penal Code Section 502, BCS is entitled to an award of damages against Defendants for injuries suffered to date by Defendants' unlawful access, as well as equitable relief or restitution, and BCS is entitled to a permanent injunction against Defendants, enjoining the ongoing conduct and restoring the accounts and returning all account credentials referenced herein to BCS.

81.     As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused loss to BCS in an amount to be proven at trial and discovery is ongoing. BCS is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code § 502(e).

## **PRAYER FOR RELIEF**

WHEREFORE, BCS prays for judgment and relief against Defendants as follows:

1.     For judgment in favor of BCS and against Defendants on all causes of action in the Complaint;

2.     For an Order directing Defendants to return all of BCS's information, credentials, and property in their possession, custody, or control;

3.     For Orders temporarily, preliminarily, and permanently enjoining Defendants and all persons or entities acting in concert with them, from directly or indirectly:

      (a)     obtaining, using, or disclosing any of the company data, including

any and all sensitive confidential and proprietary information, and any and all donor contact information, belonging to BCS for any purpose whatsoever;

(b) accessing, retrieving, copying, deleting, destroying, altering, or disseminating any hard or electronic copies of documents containing BCS's confidential and proprietary information; and

(c) using, on their own behalf or on behalf of Defendants, or providing Defendants' or their employees, or any other third party, with BCS donor-specific or employee-specific information, not independently readily available to Defendants' personnel, in order to enable them to solicit BCS's donors, or potential donors, including but not limited to any information downloaded from BCS's computers, networks, or online accounts, which have been subsequently uploaded to Defendants' computers, networks, or online accounts.

4. For an order to inspect Defendants' personal and/or business computer systems to determine where and to whom BCS's proprietary and confidential information has been disseminated;

5. For three times the amount of actual damages, including lost income, according to proof, as set forth herein, in an amount in excess of the jurisdictional requirements;

6. For restitution and disgorgement of all ill-gotten gains as set forth herein, in an amount to be proven at trial, but at least in excess of the jurisdictional requirements;

7. For punitive and exemplary damages, according to proof at trial, for all causes of action for which such damages are authorized;

8. For reasonable attorneys' fees and costs incurred herein,

9.      For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which BCS has suffered as a result of Defendants' wrongful and unlawful acts; and

10.     For any other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff BCS demands a trial by jury.


Dated:  March 28, 2022              **DLA PIPER LLP (US)**


                                    By: /s/ Tamany J. Vinson Bentz
                                    _____

                                    TAMANY J. VINSON BENTZ
                                    JONATHAN D. KINTZELE

                                    Attorneys for Plaintiff
                                    BREAKING CODE SILENCE