JOSHUA N. KASTAN (SBN 284767)
JNK@dkmlawgroup.com
JESSICA J. ROSS (SBN 313988)
JJR@dkmlawgroup.com
**DKM LAW GROUP, LLP**
50 California St., Suite 1500
San Francisco, CA 94111
Telephone:(415) 421-1100
Facsimile: (415) 842-0095

Attorneys for Defendant,
USAA CASUALTY INSURANCE COMPANY

# IN UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY R. WHITELEY,<br><br>Plaintiff,<br><br>vs.<br><br>USAA CASUALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO.: 2:24-cv-00138-FLA-MAA<br><br>**DECLARATION OF JESSICA J. ROSS IN SUPPORT OF DEFENDANT USAA CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date:** March 14, 2025<br>**Hearing Time:** TBD<br>**Crtrm.:** 6B<br>**Judge:** Hon.Aenlle-Rocha<br>**Cmplt. Filed:** Jan. 5, 2024 |

I, Jessica J. Ross, declare as follows:

1.     I am an attorney at law duly licensed to practice in all of the courts of the State of California. I am a member of the law firm DKM Law Group, LLP, counsel for Defendant USAA Casualty Insurance Company ("USAA CIC") in the above-referenced matter. I have personal knowledge of each matter stated herein,

and, if called as a witness, I would competently testify to all of the following based on my own personal knowledge.

2.      I submit this declaration in support of the Motion for Summary Judgment on behalf of USAA CIC.

3.      USAA CIC issued a Homeowners Policy for the property located at 6721 E McDowell Road, Unit 322C, Scottsdale, Arizona 85257, Policy No. 00777 83 75 90A, effective from September 1, 2021 through September 1, 2022.

      a.      Attached hereto as **Exhibit 1** is a true and correct copy of the Certified Homeowners Policy. For ease of reference of review, excerpts of the relevant portions of the Policy are attached. USAA CIC can provide the complete certified policy upon request.

4.       USAA CIC issued Umbrella Policy, No. 007778375-70U, effective from January 16, 2022 through May 13, 2022.

      a.      Attached hereto as **Exhibit 2** is a true and correct copy of the Certified Umbrella Policy. For ease of reference of review, excerpts of the relevant portions of the Policy are attached. USAA CIC can provide the complete certified policy upon request.

5.      On November 21, 2024, Plaintiff's counsel took the deposition of Mark Israel.

a.      Attached hereto as **Exhibit 17** is a true and correct copy of the relevant excerpts of the deposition transcript of Mark Israel, dated November 21, 2024.

6.      Pursuant to Local Rule 7-3 and Honorable Judge Fernando Aenlle-Rocha's Standing Order, I met and conferred with Plaintiff's counsel by way of telephone conference on December 12, 2024, and follow up e-mail thereafter. Despite the meet and confer efforts, counsels were unable to informally resolve the coverage issues underlying USAA CIC's Motion for Summary Judgment.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 31st day of January, at Raleigh, North Carolina.

_/s/Jessica J. Ross_____
JESSICA J. ROSS

# Exhibit "1"



Member Name: JEREMY R WHITELEY
Member Number: 00777 83 75 90A
Loss Report Number: 29
Date of Loss: 03/28/2022
Company: USAA CASUALTY INSURANCE COMPANY

## Texas Unsworn Declaration

My name is Mary Ann Rice, my date of birth is March 18, 1960, and my work address is 9800
Fredericksburg Road, San Antonio, Texas 78288, and United States of America.

I declare under penalty of perjury that the foregoing and attached (policy) is a true and correct copy.

E-SIGNED by Mary Ann Rice
on 2022-05-03 01:49:04 GMT
Signature

Executed in Bexar County, State of Texas, on  May 03, 2022                         .

(Date)

Internal

**WHITELEY_HO_CP_001**

**USAA®**

MAIL MACH-I
11296

11/09/21

## HOMEOWNERS POLICY PACKET

EFFECTIVE: 11-09-21 TO: 09-01-22

JEREMY R WHITELEY
6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE AZ 85257-3105

CIC      00777 83 75      90A

## IMPORTANT MESSAGES

Refer to your Declarations Page and endorsements to verify that coverages, limits, deductibles and other policy details are correct and meet your insurance needs. Required information forms are also enclosed for your review.

This is not a bill. Any premium charge or return for this policy will be reflected on your next regular monthly statement.

**To receive this document and others electronically or view your policy summary online, go to usaa.com.**

For U.S. Calls: Policy Service (800) 531-8111. Claims (800) 531-8222.

HOCS1                                    **WHITELEY_HO_CIP 70020406**

USAA CASUALTY INSURANCE COMPANY   MAIL MACH-I

**USAA®**

**9800 Fredericksburg Road - San Antonio, Texas 78288**

AMENDED DECLARATIONS PAGE - EFFECTIVE  11/09/21

| Named Insured and Residence Premises | Policy Number |
|---|---|
| JEREMY R WHITELEY | CIC   00777 83 75  90A |

6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE, MARICOPA, AZ  85257-3105

Policy Period From:  09/01/21      To:  09/01/22
(12:01 A.M. standard time at location of the residence premises)

### SECTION I - COVERAGES AND AMOUNTS OF INSURANCE

| | |
|---|---|
| COVERAGE A - DWELLING PROTECTION | $122,000 |
| COVERAGE C - PERSONAL PROPERTY PROTECTION | $20,500 |
| COVERAGE D - LOSS OF USE PROTECTION (UP TO 12 MONTHS) | $8,200 |

**SECTION II - COVERAGES AND LIMITS OF LIABILITY**

| | |
|---|---|
| Personal Liability – Each Occurrence | $1,000,000 |
| Medical Payments to Others | $5,000 |

**DEDUCTIBLES (Applies to SECTION I Coverages ONLY)**
We cover only that part of the loss over the deductible stated.
ALL PERILS                           $1,000

| | |
|---|---|
| **POLICY PREMIUM for Section I and Section II Coverages Above** | $938.35 |

**CREDITS AND DISCOUNTS** (Included in policy premium above.)      $366.36 CR
Details on the following page. (If applicable)

| | |
|---|---|
| **OTHER COVERAGES AND ENDORSEMENTS** | $63.65 |

Forms and Endorsements are printed on the following page.

**STATE SURCHARGES AND TAXES** (Shown below if applicable)

**TOTAL POLICY PREMIUM**
Including Credits, Discounts, Optional Coverages, Endorsements, State Surcharges and Taxes

$1,002.00

PREMIUM DUE AT INCEPTION. THIS IS NOT A BILL.

**FIRST MORTGAGEE:**
BOEING EMPLOYEES' CREDIT UNION, ITS SUCCESSORS      LOAN NR      0145954244
AND/OR ASSIGNS, ATIMA,  C/O CENTRAL LOAN
ADMINISTRATION AND REPORTING, PO BOX 202028
FLORENCE,SC  29502-2028

In witness whereof, this policy is signed on  11/08/21

Karen Morris, Secretary      James Syring, President

**REFER TO YOUR POLICY FOR OTHER COVERAGES, LIMITS AND EXCLUSIONS.**

HO-D1 (07–08)              ATTACH THIS DECLARATION TO PREVIOUS   WHITELEY_HO_CP_004   028-0708

Homeowners 6R(02)
Unit-Owners Form
(07-08)
HO 2008 Program

## AGREEMENT

In return for payment of premium and subject to all terms of this policy, we will provide the insurance described.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse when a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. Certain words and phrases are defined and are printed in boldface and quotation marks when used.

1.  "Actual cash value" is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. "Actual cash value" applies to valuation of covered property regardless of whether that property has sustained partial loss, or total loss. The "actual cash value" of lost or damaged property may be significantly less than its replacement cost.

2.  "Aircraft" means any conveyance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

3.  "Bodily injury" means physical injury, sickness or disease, including required care, loss of services and death that results.

    "Bodily injury" does not include mental injuries such as: emotional distress, mental anguish, humiliation, mental distress, or any similar injury unless it arises out of physical injury to the person claiming a mental injury.

4.  "Business" means any full or part-time activity arising out of or related to any trade, profession or occupation of any "insured".

5.  "Collapse" means:
    a.  A sudden falling or caving in;

    b.  A sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use.

    Damage consisting solely of settling, cracking, shrinking, bulging or expansion is not covered unless it is the direct result of "collapse".

6.  "Damages" means compensatory damages the "insured" is legally obligated to pay as a result of "bodily injury" or "property damage" covered by this insurance, but does not include punitive, exemplary or multiple damages.

7.  "Fungus" means any microorganism or by-product of any microorganism, including, but not limited to mold, mildew, fungi, mycotoxins and spores.

8.  "Hovercraft" means a self-propelled motorized ground effect vehicle and includes, but is limited to, flarecraft and air cushion vehicles.

9.  "Insured" means:
    a.  The "member";
    b.  Spouse when a resident of the same household, and
    c.  Residents of your household who are:
        (1) Your relatives; or

WHITELEY_HO_CP_007

(2) Other persons under the age of 21 and in the care of any person named above.

Under SECTION II, "insured" also means:

d. With respect to animals, "watercraft" or "personal watercraft" to which this policy applies, any person or organization legally responsible for these animals, "watercraft" or "personal watercraft" which are owned by you or any person included in 9.a., 9.b or 9.c above. A person or organization using or having custody of these animals "watercraft" or "personal watercraft" without consent of the owner is not an "insured".

e. With respect to any vehicle or conveyance to which this policy applies:

   (1) "Residence employees" while engaged in your employ or that of any person included in 9.a, 9.b. or 9.c. above; or

   (2) Other persons using the vehicle on an "insured location" with your consent.

10. "Insured location" means:

   a. The "residence premises";

   b. Any premises used by you in connection with a 10.a. above;

   c. Any part of a premises:

      (1) Not owned by any "insured"; and

      (2) Where any "insured" is temporarily residing;

   d. Vacant land, other than farm land owned by or rented to any "insured";

   e. Land owned by or rented to any "insured" on which a one or two family dwelling is being built as residence for any "insured";

   f. Individual or family cemetery plots or burial vaults of any "insured"; or

g. Any part of a premises occasionally rented to any "insured" for other than "business" use.

11. "Member" means the owner of the policy who is the person who meets all eligibility requirements for membership and whose membership number is shown in the Declarations of this policy.

12. "Motor vehicle(s)" means any type of motorized land vehicle or conveyance, whether or not subject to motor vehicle registration.

13. "Named peril(s)" means one or more of the perils listed under LOSSES WE COVER.

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. "Bodily injury"; or

   b. "Property damage".

15. "Personal watercraft" means a conveyance, used or designed to be used on water that uses a jet pump powered by an internal combustion engine as the primary source of propulsion.

16. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

17. "Professional services" means any type of service to the public that requires members rendering a service to obtain an advanced degree and/or obtain a license or other legal authorization to provide the service and includes, but is not limited to services rendered by dentists, naturopaths, chiropractors, physicians and surgeons, doctors of dentistry, physical therapists, occupational therapists, podiatrists, optometrists, nurses, nurse-midwives, veterinarians, pharmacists, architects, landscape architects, engineers, accountants, land surveyors, psychologists, attorney-at-law, therapists, counselors and social workers.                    Page 2 of 30

HO-6R(02) (07-08)

WHITELEY_HO_CP_008

18. "Property damage" means physical damage to, or destruction of tangible property, including loss of use of this property.

19. "Residence employee" means an employee of any "insured" whose primary duties are related to the maintenance or use of the "residence premises", including household or domestic service.

20. "Residence premises" means:

    a. The one family dwelling, other structures, and grounds; or

    b. That part of any other building;

    Where you reside and which is shown as the "residence premises" in the Declarations.

"Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

21. "Sudden and accidental" means an abrupt, fortuitous event which is unintended from the perspective of a reasonable person.

22. "War" means war whether declared or undeclared; civil war; insurrection; rebellion; revolution; any warlike act by friendly or enemy forces, destruction or seizure for a military purpose.

23. "Watercraft" means a conveyance principally designed to be propelled on or in water by wind, current, paddles, oars, engine power or electric motor.

## DEDUCTIBLE

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the applicable amount of insurance that applies, we will pay only that part of the total of all loss payable under SECTION I - PROPERTY WE COVER that exceeds the deductible amount shown in the Declarations.

## SECTION I - PROPERTY WE COVER

COVERAGE A - Dwelling Protection

We cover:

1. The alterations, appliances, custom or permanently installed window treatments, permanently installed carpeting, fixtures and improvements which are part of the building and contained within the "residence premises";

2. Items of real property which pertain exclusively to the "residence premises";

3. Property which is your insurance responsibility under a corporation or association of property owners agreement; and

4. Structures owned solely by you, other than the "residence premises", at the location of the "residence premises".

    This coverage does not apply to land, including land on which the "residence premises", real property or structures are located.

We do not cover:

1. Structures used in whole or in part for "business" purposes; or

2. Structures rented or held for rental to any person not a tenant of the "residence premises", unless used solely as a private garage.

HO-6R(02) (07-08)

Page 3 of 30

**WHITELEY_HO_CP_009**

HO-82 (07-08)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

PERSONAL INJURY ENDORSEMENT

For an additional premium, Section II – LIABILITY COVERAGES, **COVERAGE E - Personal Liability** is deleted and replaced by the following:

**COVERAGE E - Personal Liability**

If a claim is made or a suit is brought against any **"insured"** for damages because of **"bodily injury"**, **"property damage"** or **"personal injury"** caused by an **"occurrence"** to which this coverage applies, we will:

1. Pay up to the limit of liability for the damages for which the **"insured"** is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claims or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay or tender for **"damages"** resulting from the **"occurrence"** equals our limit of liability. This coverage does not provide defense to any **"insured"** for criminal prosecution or proceedings.

We will not pay for punitive **"damages"** or exemplary **"damages"**, fines or penalties.

The following definition is added:

**"Personal Injury"** means:

   a. Wrongful eviction, wrongful entry.
   b. Libel.
   c. Slander.
   d. Defamation of character.
   e. Invasion of rights of privacy.
   f. Wrongful detention, false arrest or false imprisonment.
   g. Malicious prosecution or humiliation.
   h. Assault and battery if committed by any insured or at his direction to protect persons or property. This applies only when the conduct is not criminal.

**"Personal injury"** only applies when the conduct is not malicious or criminal in nature.

The definition of **"occurrence"** is deleted and replaced by the following:

**"Occurrence"** means:

   a. An accident, including continuous or repeated exposure to substantially the same generally harmful conditions, which results, during the policy period, in **"bodily injury"** or **"property damage"**.
   b. An event or series of events, including injurious exposure to conditions, proximately caused by an act or omission of any **"insured"**, which results, during the policy period, in **"personal injury"**, neither expected nor intended from the standpoint of the **"insured"**.

**SECTION II - EXCLUSIONS**

Under Item 1. **Coverage E - Personal Liability** and **Coverage F - Medical Payments to Others,** with respect to personal injury only, paragraph a. is deleted and replaced by:

   a. which is expected or intended by the **"insured"**:

The following exclusions are added with respect to **"personal Injury"**:

1. Arising out of an **"insured's"** activities as an officer or director of any organization; this does not apply to non-profit religious or charitable organizations when the activity is not connected with the **"insured's"** **"business"**, profession or occupation and the **"insured"** is not compensated for the activity.

HO-82  (07-08)

87034-0708
Page 1 of 2

**WHITELEY_HO_CP_065**

Coverage for officers or directors of religious or charitable organization does not extend in any way to liability which arises out of, involves or is directly or indirectly founded upon any person's or organization's rendering or failure to render:

a. clinical services;
b. mental, dental or physical health services;
c. medical services of any kind, including therapeutic or rehabilitative services;

2. Arising out of discrimination and violation of civil rights where recovery is permitted by law.

3. Arising out of any actual, alleged or threatened:

a. sexual misconduct;
b. sexual harassment; or
c. sexual molestation.

4. Arising out of any actual, alleged or threatened physical or mental abuse.

5. Arising out of libel, slander or defamation of character that is published by the **"insured"** on the internet.

Except as specifically modified in this endorsement, all provisions of the policy to which this endorsement is attached also apply to this endorsement.

**Term Premium:** $47.38

Copyright, USAA, 2008. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**WHITELEY_HO_CP_066**

# Exhibit "2"

USAA

Member Name: JEREMY R WHITELEY
Member Number: 00777 83 75 70U
Loss Report Number: 30
Date of Loss: 03/28/2022
Company: USAA CASUALTY INSURANCE COMPANY

## Texas Unsworn Declaration

My name is Mary Ann Rice, my date of birth is March 18, 1960, and my work address is 9800 Fredericksburg Road, San Antonio, Texas 78288, and United States of America.

I declare under penalty of perjury that the foregoing and attached (policy) is a true and correct copy.

E-SIGNED by Mary Ann Rice
on 2022-05-05 21:37:08 GMT

Signature

Executed in Bexar County, State of Texas, on ___May 05, 2022_____.

(Date)

Internal – USAA Information

WHITELEY_UMB_CP_001



CIC 00777 83 75 70U
1063X
DM-03037

UMBRELLA POLICY PACKET

Effective: 01/16/2022 to 05/13/2022
CIC 00777 83 75 70U

### Important Messages

Refer to your Declarations Page and endorsements to verify that coverage, limits and other policy details are correct and meet your insurance needs. Required information forms are also enclosed for your review.

This is not a bill. Any premium charge or return for this policy will be reflected on your next regular monthly statement. To receive this document and others electronically or to view your policy summary online, go to usaa.com. You may also contact us at 210-531-USAA (8722), our mobile shortcut #8722 or 800-531-USAA (8722).

WHITELEY_UMB_CP_002



CIC 00777 83 75 70U
DM-03037

USAA CASUALTY INSURANCE COMPANY
(A Stock Insurance Company)
9800 Fredericksburg Road, San Antonio, Texas 78288
**PERSONAL UMBRELLA POLICY DECLARATIONS -** Amended

Policy Number: CIC 00777 83 75 70U

Effective: From 01/16/2022 to 05/13/2022
(12:01 A.M. standard time at Umbrella Base Location)

Named Insured and Mailing Address:
JEREMY R WHITELEY
6721 E MCDOWELL RD UNIT 322C
SCOTTSDALE AZ 85257-3105

Umbrella Base Location:
6721 E Mcdowell Rd
Scottsdale, Maricopa, AZ 85257

| | Limit (per occurrence) | Premium |
|---|---|---|
| Umbrella Liability | $3,000,000 | $557.56 |
| | **Total** | **$557.56** |

PREMIUM DUE AT INCEPTION

## SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF INSURANCE | REQUIRED MINIMUM LIMITS | | | |
|---|---|---|---|---|
| | Bodily Injury | Property Damage | OR | Combined Single Limit |
| Private Passenger Vehicle Liability | $300,000/$500,000 | $100,000 | OR | $500,000 |
| Miscellaneous Vehicle Liability | $250,000/$500,000 | $100,000 | OR | $500,000 |
| Personal Liability | | | | $300,000 |
| Watercraft/Pers Watercraft Liability | | | | $300,000 |

**USAA requires you to maintain NO LESS THAN the above REQUIRED MINIMUM LIMITS. See the Required Minimum Insurance Condition in your policy.**

**Please verify your actual limits and exposures on the attached Supplemental Declarations.**

REVISED ANNUAL PREMIUM $557.56.   ANNUAL INCREASE $154.88.

ADJUSTMENT REASON(S):
Increase in Umbrella Liability Limit

ENDORSEMENTS:
Added: NONE
Remain in Effect (Refer to Previous Policy) -  PU-100AZ (07-09), PU-2009 (07-09), PU-2011 (04-11)

In WITNESS WHEREOF, we have caused this policy to be signed by our President and Secretary at
San Antonio, Texas, on this date 01/17/2022.

Karen Morris, Secretary

James Q. Syring
James Syring, President

PU2009D (05-13)

89853-0513
Page 1 of 1

WHITELEY_UMB_CP_003

CIC 1234 56 78 70U

## AGREEMENT

In return for payment of premium and subject to all terms of this policy, we will provide the insurance described.

However, this policy provides no uninsured motorists coverage, underinsured motorists coverage, auto no-fault coverage or medical payments coverage.

## DEFINITIONS

The words defined below are used throughout this policy. They are in **boldface** when used.

A. "**You**" and "**your**" refer to the "named insured" shown on the Declarations and spouse if a resident of the same household.

B. "**We**," "**us**" and "**our**" refer to the Company providing this insurance.

C. "**Aircraft**" means any conveyance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

D. "**Bodily injury**."

   1. "**Bodily injury**" means bodily harm, sickness, disease or death.

   2. "**Bodily injury**" does not include mental injury such as emotional distress, mental anguish, humiliation, mental distress, or any similar injury unless it arises out of physical injury to some person.

E. "**Business**" means any full or part-time activity arising out of or related to any trade, profession or occupation of any **insured**.

F. "**Business property**" means any property on which a **business** is conducted.

G. "**Driving contest or challenge**" includes, but is not limited to:

   1. A competition against other people, vehicles, or time; or

   2. An activity that challenges the speed or handling characteristics of a vehicle or improves or demonstrates driving skills, provided the activity occurs on a track or course that is closed from non-participants.

H. "**Family member**" means a person related to **you** by blood, marriage, or adoption who is a resident of **your** household. This includes a ward or foster child who is a resident of **your** household.

I. "**Fungus**" or "**fungi**" means any microorganism or byproduct of any microorganism, including but not limited to mold, mildew, fungi, mycotoxins and spores.

J. "**Hovercraft**" means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles.

K. "**Insured**."

   1. "**Insured**" means:

     a. **You** and any **family member**;

     b. Other residents of **your** household under the age of 21 and in the care of **you** or any **family member**;

     c. Any person or organization legally responsible for animals, **watercraft** or **personal watercraft**:

       (1) To which this policy applies; and

       (2) Which are owned by any person in K.1.a. or K.1.b. above.

     d. Any person using a **motor vehicle**, **watercraft** or **personal watercraft** to which this policy applies, provided that such use is with the consent of any **insured**.

   2. However, "**insured**" does not include:

PU-2009 (07-09)

Page 2 of 10

WHITELEY_UMB_CP_009

CIC 1234 56 78 70U

a. The owner of a **motor vehicle**, **watercraft** or **personal watercraft** loaned or rented to any **insured**. "Owner" in this paragraph includes the owner's agents or employees.

b. Any **motor vehicle** sales agencies, repair shops, service stations, storage garages or public parking lots, their owners, agents or employees.

c. Any shipyards, **watercraft** repair yards, marinas, yacht clubs, **watercraft** sales agencies, **watercraft** service stations and the like, their owners, agents or employees.

d. The lessee of a **motor vehicle**, **watercraft** or **personal watercraft** owned by any **insured**.

e. A person or organization using or having custody of animals, **watercraft** or **personal watercraft**, to which this policy applies, in the course of any **business** or without the consent of any **insured**.

L. "**Miscellaneous vehicle**" means the following motorized vehicles: all terrain vehicles; antique vehicles; classic vehicles; dune buggies; golf carts; motorcycles; motor homes; and snowmobiles.

M. "**Motor vehicle**" means any type of motorized land vehicle or conveyance, whether or not subject to motor vehicle registration. **Motor vehicle** includes:

1. Private passenger vehicles, other than antique vehicles and classic vehicles; and

2. **Miscellaneous vehicles**.

N. "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in **bodily injury** or **property damage**.

O. "**Personal injury**" means injury arising out of one or more of the offenses listed below, but only if the **insured's** act occurred during the policy period. A series of similar or related acts by an **insured**, multiple publications of the same statement, and continuous or repeated injury from the same act or publication, will be considered a single offense and injury during the single policy period in which the first act or publication occurred.

1. Oral, written or electronic publication of a false statement that defames a person's or organization's character or reputation.

2. Oral, written or electronic publication of material that violates a person's right of privacy by publicly disclosing private facts.

3. Malicious prosecution.

4. False arrest, false imprisonment, wrongful detention.

5. When committed by or on behalf of the owner, landlord or lessor of a room, dwelling or premises that a person occupies:

   a. Wrongful eviction;

   b. Wrongful entry; or

   c. Invasion of the right of private occupancy.

6. Assault and battery if committed by any **insured**, or at his direction, to protect persons or property. This applies only when the conduct is not criminal.

P. "**Personal watercraft**" means a conveyance, used or designed to be used on water that uses a jet pump powered by an internal combustion engine as the primary source of propulsion.

Q. "**Professional services**" means any type of service to the public that requires the person rendering the service to obtain:

1. An advanced degree; or

2. A license; or

WHITELEY_UMB_CP_010

CIC 1234 56 78 70U

3. Other legal authorization to provide the service.

R. "**Property damage**."

1. "**Property damage**" means physical damage to or destruction of tangible property including loss of use of this property.

2. For purposes of this policy, electronic data is not tangible property. Electronic data means information, facts or programs:

   a. Stored as or on;

   b. Created or used on; or

   c. Transmitted to or from;

   computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

S. "**Retained limit**" means the required minimum limit of liability for the applicable personal lines insurance coverage shown in the Schedule of Underlying Insurance on the Declarations. Where **underlying insurance** is payable for any one **occurrence** to which this policy also applies, the amount of the **retained limit** will be either:

1. The split Bodily Injury/Property Damage limit shown in the Schedule, if **underlying insurance** has split limits; or

2. The Combined Single Limit shown in the Schedule, if **underlying insurance** has a combined single limit.

Where **underlying insurance** is not payable for any one **occurrence** to which this policy applies, the amount of the **retained limit** will be the split Bodily Injury/Property Damage limit shown in the Schedule.

T. "**Underlying insurance**" means the types of personal lines insurance coverages for which limits are shown in the Schedule of Underlying Insurance on the Declarations.

U. "**Watercraft**" means a conveyance principally designed to be propelled on or in water by wind, current, paddles, oars, engine power or electric motor.

## LIABILITY COVERAGES

INSURING AGREEMENT

A. Damages.

1. **We** will pay for damages, in excess of the **retained limit**, that an **insured** becomes legally obligated to pay because of **bodily injury** or **property damage** resulting from an **occurrence**.

2. **We** will pay for damages that an **insured** becomes legally obligated to pay because of **personal injury**.

B. Defense.

1. If a claim is made or a suit is brought against any **insured** for **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, or for **personal injury** to which this policy applies, **we** will provide a defense at **our** expense by counsel of **our** choice, even if the suit is groundless, false or fraudulent.

   However, **we** will not provide a defense:

   a. To any **insured** for criminal prosecution or proceedings; or

   b. If the **occurrence** or offense is covered by **underlying insurance** or any other liability insurance available to any **insured**.

WHITELEY_UMB_CP_011

2. **We** may investigate and settle any claim or suit that **we** decide is appropriate. **Our** duty to defend ends when the amount **we** pay to settle any claim, or in full or partial satisfaction of any judgment for damages resulting from the **occurrence** or offense, equals the Umbrella Liability Limit shown on the Declarations.

3. **We** have the right, but not the duty, to join with any **insured** or with the insurer providing **underlying insurance** in the investigation, defense or settlement of any claim or suit, or in any alternative dispute resolution process, which may require **us** to pay.

4. **We** may appeal a judgment in excess of the **retained limit** even if either the **insured** or the insurer providing the **underlying insurance** chooses not to appeal. If **we** do appeal, **we** will pay all related expenses.

LIMIT OF LIABILITY

A. Damages.

1. **Our** maximum limit of liability under this policy for all damages resulting from any one **occurrence,** or any one offense listed as **personal injury**, is the Umbrella Liability Limit shown on the Declarations.

2. This Umbrella Liability Limit is the most **we** will pay regardless of the number of suits or size of awards made, and regardless of the number of **insureds**, claims made or persons injured.

B. Defense. Defense costs are in addition to the Umbrella Liability Limit shown on the Declarations and include the following:

1. Premiums on appeal bonds and bonds to release attachments in any suit **we** defend. But **we** will not pay the premium for bonds with a face value over the Umbrella Liability Limit shown on the Declarations. **We** have the right, but not the duty, to either apply for or furnish any bond.

2. Expenses incurred by **us** or at **our** request on behalf of any **insured**, including court costs. **We** will pay interest on any part of a judgment covered by this policy.

3. Prejudgment interest awarded against any **insured** on that part of the judgment that is covered by this policy. If **we** make an offer to pay the applicable limit of liability available under this policy, **we** will not pay any prejudgment interest incurred or accrued after the offer is made.

4. Reasonable expenses incurred by any **insured** at **our** request, including actual loss of earnings (but not loss of other income) up to $250 per day for assisting **us** in the investigation or defense of a claim or suit.

## EXCLUSIONS

A. This insurance does not apply to:

1. Any loss assessments charged against any **insured** as a member of an association, corporation or community of property owners.

2. A nuclear energy **occurrence** that is covered by a nuclear energy liability policy, or would have been covered if the available liability insurance had not been used up.

3. Punitive or exemplary damages, fines or penalties.

CIC 1234 56 78 70U

B. This insurance does not apply to **bodily injury** to any person eligible to receive any benefits, whether voluntarily provided or required to be provided, by any **insured** under any:

1. Workers' Compensation law;

2. Non-occupational Disability law; or

3. Occupational Disease law.

C. This insurance does not apply to **property damage** to:

1. Property owned by any **insured**.

2. Any **aircraft** owned, hired, rented or used by, or in the care, custody or control of, any **insured**.

3. Property owned by others when any **insured** has physical control of such property, or has agreed to be responsible for or insure such property.

Paragraph 3. of this exclusion (C.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

D. This insurance does not apply to **personal injury** which results from a false statement if done by or at the direction of any **insured** with knowledge that the statement was false, or made with reckless disregard for the truth.

E. This insurance does not apply to **bodily injury** or **property damage**:

1. Caused by the intentional or purposeful acts of any **insured** that would be expected by any reasonable person to result in **bodily injury** or **property damage**. This applies even if the resulting **bodily injury** or **property damage**:

   a. Is of a different kind, quality or degree than initially expected or intended; or

   b. Is sustained by a different person, entity, real property or personal property than initially expected or intended.

This exclusion (E.1.) does not apply to **bodily injury** or **property damage** resulting from the use of lawful reasonable force by any **insured** to protect persons or property.

2. Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of or presence of any **fungus**, wet or dry rot, or bacteria.

This exclusion (E.2.) does not apply to any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for consumption.

3. Arising out of the use of any **motor vehicle** while that **motor vehicle** is being operated in, or in practice for, any **driving contest** or **challenge**.

F. This insurance does not apply to **bodily injury** or **personal injury**:

1. Sustained by any **insured**.

2. Arising out of illegal discrimination or violation of civil rights.

3. Arising out of any actual, alleged or threatened:

   a. Sexual misconduct;

   b. Sexual harassment;

   c. Sexual molestation; or

   d. Physical or mental abuse.

4. Arising out of the transmission of any communicable disease by any **insured**.

G. This insurance does not apply to **bodily injury, property damage** or **personal injury**:

1. Arising out of property any **insured** sells, gives away or abandons.

This exclusion (G.1.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

2. Arising out of:

WHITELEY_UMB_CP_013

a. The ownership, maintenance, use, loading or unloading of; or

b. The entrustment by any **insured** of; or

c. Vicarious liability, whether or not statutorily imposed, for the actions of anyone using;

a **motor vehicle, personal watercraft** or **watercraft**.

This exclusion (G.2.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

3. Arising out of:

a. The ownership, maintenance, use, loading or unloading of; or

b. The entrustment of any **insured** of; or

c. Vicarious liability, whether or not statutorily imposed, for the actions of anyone using;

an **aircraft** or **hovercraft**.

4. Arising out of the rental or holding for rental of any part of any premises, including any real property or real estate, by any **insured**.

This exclusion (G.4.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

5. Arising out of any **business** or **business property** of any **insured**.

This exclusion (G.5.) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

6. Arising out of the rendering of or failure to render **professional services**.

7. Arising out of a criminal act or omission by, or with either the knowledge or consent of, any **insured**.

8. Arising directly or indirectly out of, or conduct resulting in: war including undeclared war; civil war; insurrection; rebellion; revolution; warlike act by a military force or military personnel; or destruction or seizure or use for a military purpose. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

9. Arising out of any **insured's** activities as an officer or member of a board of directors of any organization.

This exclusion (G.9.) does not apply to non-profit religious, charitable or civic organizations when:

a. The activity is not connected with any **insured's business**; and

b. The **insured** is not compensated for the activity other than reimbursement of out-of-pocket expenses.

10. Arising out of any contract or agreement.

This exclusion (G.10) does not apply to the extent that liability coverage is provided by **underlying insurance** and is not excluded elsewhere in this policy.

11. Arising out of the actual, alleged or threatened discharge, dispersal, release, escape, seepage or migration of pollutants however caused and whenever occurring. This includes any loss, cost or expense arising out of any:

a. Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

WHITELEY_UMB_CP_014

# Exhibit "17"

Page 1

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    JEREMY R. WHITELEY,                    )
                                            ) Case No. 2:24-
5                                           ) cv-00138-FLA-MAA
                     Plaintiff,             )
6                                           )
            vs.                             )
7                                           )
     USAA CASUALTY INSURANCE COMPANY,       )   Certified Transcript
8                                           )
                 Defendant.                 )
9    _____)   (Pages 1-53)

10

11

12        VIDEOTAPED REMOTE DEPOSITION OF MARK ISRAEL

13              THURSDAY, NOVEMBER 21, 2024

14

15

16

17

18

19

20

21

22

23   Reported By:  SANDRA DUBIN,
                   CA CSR No. 5535
24

25

Page 6

1             LOS ANGELES, CALIFORNIA
2             THURSDAY, NOVEMBER 21, 2024
3             1:29 P.M.
4
5       THE VIDEOGRAPHER: We are now recording and on
6 the record. My name is Brandon Iorlano. I am a
7 legal video specialist for iDepo Reporters. Our
8 business address is 898 North Pacific Coast Highway,
9 Suite 475, El Segundo, California 90245.
10       I am not related to any party in this
11 action nor am I financially interested in the
12 outcome in any way. Today is November 21st, 2024.
13 The time is 1:29 p.m. Pacific.
14       This is the deposition of Mark Israel in
15 the matter of Jeremy R. Whiteley, the plaintiff,
16 versus USAA Casualty Insurance Company, the
17 defendant in the United States District Court,
18 Central District of California. Case No.
19 2:24-cv-00138-FLA-MAA.
20       This deposition is being taken remotely on
21 behalf of the plaintiff. The court reporter is
22 Sandy Dubin of iDepo Reporters.
23       Counsel, will you please state your
24 appearances.
25       MS. CLECICOV: Daria Clecicov on behalf of

Page 7

1 Jeremy Whiteley, plaintiff Jeremy Whiteley.
2       MR. KASTAN: Josh Kastan on behalf of USA
3 Casualty Insurance Company or USAA CIC as well as
4 Mark Israel, a third-party witness.
5       THE VIDEOGRAPHER: Madam court reporter, could
6 you please administer the oath.
7
8             MARK ISRAEL,
9       having been sworn in by the deposition
10       officer, remotely, was examined and
11       testified as follows:
12
13             EXAMINATION
14 BY MS. CLECICOV:
15    Q   Good afternoon, Mr. Israel.
16    A   Good afternoon.
17    Q   Thank you for making the time to be here
18 today. I am sure your schedule is very busy. I
19 will try to make this as short as possible.
20       I presume you have been deposed before --
21 well, you have taken and defended depositions before
22 so we can dispense with the normal admonitions?
23    A   Yeah.
24    Q   Great. Have you been deposed before?
25    A   Yes.

Page 8

1    Q   In what capacity?
2    A   I have been deposed perhaps eight to ten
3 times as an expert witness. And a couple of
4 additional times as just a regular witness such as
5 this case.
6    Q   Got it. When you were deposed as an
7 expert witness was it in your capacity as insurance
8 coverage counsel or --
9    A   Yeah.
10    Q   -- coverage?
11    A   Coverage expert. Yes.
12    Q   Right. Have you been deposed or testified
13 in matters where USAA was a party?
14    A   I believe I have on one occasion to my
15 recollection.
16    Q   Was it in the similar capacity as you are
17 testifying today?
18    A   I believe so. Yes.
19    Q   Okay. Do you remember when that was?
20    A   I don't specifically. I would say five or
21 six years ago.
22    Q   How long have you practiced law?
23    A   About 38 years.
24    Q   And how long have you specialized in
25 insurance coverage?

Page 9

1    A   Thirty-seven years.
2    Q   How often do you review claims for USAA?
3    A   Well, that kind of varies over time.
4 There are times when I have reviewed multiple claim
5 files and other times when not as many. So I have
6 done work for USAA since the very beginning of my
7 career. But the volume has changed over time.
8    Q   Do you get assignments from them or jobs
9 from them, like, on a yearly basis? Would you say
10 it's multiple times a year or does it vary?
11    A   It does vary. Multiple times per year.
12 But how many times in a given year it's variable.
13    Q   Got it. How about third-party claims as
14 we have in this case, do you get a lot of these
15 types of duty to defend claims?
16    A   Yes.
17    Q   So is it both first-party and
18 third-party --
19    A   Yes.
20    Q   -- cases?
21    A   Yes.
22    Q   Do you ever find there is a duty to defend
23 in these types of claims?
24    A   Yes.
25    Q   What would be the approximate percentage

Page 22

1   A   That would take several leaps of
2   speculation to conjure that into an allegation --
3   factual allegation of defamation with respect to
4   Mr. Whiteley. Again, the speculation as to what a
5   complaint is attempting to allege is not sufficient
6   to trigger a duty to defend.
7       Q   Okay. But Mr. Whiteley is a defendant in
8   this lawsuit; right?
9       A   Yes.
10      Q   This allegation states that:
11              "Defendants engage in disclosure
12              of misleading information."
13          Right?
14      A   Yes.
15      Q   That's not enough to trigger duty to
16   defend or --
17      A   It doesn't say that it was false
18   information. It doesn't say it was defamatory
19   information. And it doesn't say that Mr. Whiteley
20   did it. So in my opinion, no, that is not
21   sufficient.
22      Q   Just to clarify, the fact that it says
23   "misleading information," that is also not
24   sufficient to trigger or to constitute defamation in
25   your opinion?

Page 23

1       A   No.
2       Q   What about paragraph 48, same sort of line
3   of questioning?
4       A   I read that the same way. That's an
5   impersonation of BCS and also is defendant singular.
6   So I don't see any clear factual allegation of
7   defamation on the part of Mr. Whiteley in that
8   paragraph.
9       Q   Does it have to be a clear factual
10  allegation to trigger the duty to defend?
11      A   Yes. There has to be a factual
12  allegation. It can't be based on speculation as to
13  what the intent was. Particularly in my opinion
14  when the cause of action is not alleged and never
15  was alleged. And this is not a complaint that was
16  not carefully drafted. It's obvious on its face it
17  was very carefully drafted. It refers only to
18  specified computer fraud and criminal statutes.
19          So in my opinion, no, this doesn't come
20  anywhere near sufficient factually to allege a
21  defamation cause of action with respect to
22  Mr. Whiteley.
23      Q   Just to be clear, there doesn't need to be
24  a cause of action for the duty to defend to be
25  triggered; right?

Page 24

1       A   There does not. But again that is a
2   relevant factor to consider. And it was not
3   alleged. Never was alleged.
4       Q   All right. Let's take a look at paragraph
5   78. Does paragraph 78 of the BCS complaint allege
6   defamation?
7       A   I don't believe it does. It refers to a
8   violation of a California Penal Code statute.
9       Q   Do I have the right -- sorry. It's 76.
10  My bad.
11      A   No.
12      Q   So it says:
13              "Defendants -- yada, yada --
14              permanently engaged in BCS --
15              permanently damaged BCS's
16              reputation and goodwill with the
17              public."
18          That's not enough to trigger allegations
19  of defamation?
20      A   No. It's certainly possible to damage
21  somebody's reputation and goodwill with the public
22  without defaming them. For example, taking down
23  their website.
24      Q   But isn't it true that any factual
25  ambiguity must be construed in favor of the insured?

Page 25

1       A   I don't consider that factual ambiguity.
2   It's a -- there is not there that alleges a
3   defamatory statement made by Mr. Whiteley about the
4   plaintiff. It is nowhere in the complaint.
5       Q   But the fact that the complaint says that
6   defendants engaged in dissemination of false
7   information or damaged BCS's reputation or disclosed
8   misleading information to the public, all of the
9   paragraphs that we just reviewed?
10      A   I would answer it exactly the same way.
11  That calls for speculation as to what the allegation
12  was, that this was intended to be an allegation of a
13  defamatory falsehood made by Mr. Whiteley about the
14  plaintiff. It's not in the complaint. It's nowhere
15  in the complaint.
16      Q   So if it calls for speculation wouldn't
17  you describe that as factual ambiguity?
18      A   I would call it speculation. There is no
19  fact there.
20      Q   Well, the complaint alleges various facts;
21  right? It makes --
22      A   Yes, it does. It's very clear and
23  detailed. Which, again, it is very clear and
24  detailed, it alleges precisely what it wishes to
25  allege and it does not allege any defamatory

Page 26

1  statement of fact by Mr. Whiteley against the
2  plaintiff.
3      Q  Got it. Okay. Thank you.
4         Let's go back to Exhibit 6. So we talked
5  about how you issued a couple of letters. One of
6  them was in May 2022. That was your first letter;
7  correct?
8      A  Yeah.
9      Q  Let me find it here. Well, there is an
10 E-mail on page 276 of Exhibit 6 between you and
11 John Kaczmarek where you essentially conclude that
12 there is no duty to defend. It's dated May 15th.
13 Then there is attachment -- the attachment to that
14 E-mail is your letter but I don't think the letter
15 is dated. So we will just for the sake of --
16     A  Correct.
17     Q  -- today we'll just call it the May 15,
18 2022 letter.
19     A  Yes.
20     Q  So looking at the analysis section -- did
21 you review this letter in preparation for your
22 deposition today?
23     A  Yes.
24     Q  Do you kind of remember what you wrote?
25     A  Yes.

Page 28

1      A  Yes. True.
2      A  None of the --
3      Q  And --
4      A  -- enumerated offenses are alleged in the
5  breaking code silence complaint.
6      Q  Right.
7         And then in the fourth paragraph you
8  indicate that:
9            "The personal injury endorsement
10           requires that any covered personal
11           injury offense must be neither
12           expected nor intended from the
13           standpoint of the insured."
14        What policy are you referring to there?
15     A  That is probably the homeowner's policy.
16     Q  I can tell you --
17     A  We can go back and look at the language
18 which is quoted earlier in the letter.
19     Q  We can. It is the homeowner's policy, I
20 believe. So this exclusion is not in the umbrella
21 policy; right?
22     A  Not in that exact phrasing. But we can
23 look and see what exclusions apply in the umbrella
24 policy.
25     Q  Just for a moment, going back to the third

Page 27

1      Q  Would it be fair to say that the first and
2  second -- well, let me rephrase that.
3         Under the heading "Coverage Determination"
4  you list the various reasons why there is no duty to
5  defend and you start your paragraphs with first, and
6  second and third and fourth.
7      A  Yes.
8      Q  I will just -- I will refer to those
9  paragraphs as first, second, third and fourth.
10        So would it be fair to say first and
11 second paragraphs deal with reasons why there is no
12 coverage for bodily injury and property damage?
13     A  Yes.
14     Q  It doesn't really talk about personal
15 injury?
16     A  Yes.
17     Q  Then the third paragraph discusses
18 personal injury; correct?
19     A  Yes.
20     Q  The third paragraph you basically conclude
21 that the complaint does not allege any personal
22 injury.
23     A  Yes.
24     Q  It's literally two sentences. There is
25 not much to it.

Page 29

1  paragraph when you concluded that the complaint did
2  not allege any personal injury, did you consider the
3  allegations pertaining to the defamation that we
4  discussed just a minute ago?
5      A  Yes.
6      Q  Is there a reason why you chose not to
7  sort of explain why those allegations weren't enough
8  to trigger the duty to defend here?
9      A  No. I mean I didn't believe it was enough
10 to trigger the duty to defend period. So I saw no
11 reason to sort of side note.
12     Q  Okay. So going back to paragraph 4, the
13 personal injury endorsement, would you agree that if
14 the insured disputes that they said anything
15 defamatory, then that would not implicate this
16 exclusion?
17        MR. KASTAN: Form. Vague and ambiguous.
18 Unintelligible.
19        THE WITNESS: Yes. I am not sure I understand
20 the question.
21 BY MS. CLECICOV:
22     Q  So if the insurer says, "I didn't make any
23 defamatory statements," would that implicate the
24 personal injury endorsement exclusion you referred
25 to in paragraph 4?

Page 30

1    A   I don't know. I think I would want to
2  know the full circumstances there. I mean the
3  allegations of this complaint are replete with
4  allegations of intentional, malicious, purposeful
5  conduct. So that is what is alleged. I don't know
6  what your hypothetical would refer to.
7    Q   So you will basically need to know what
8  the insurer -- where the insurer stands on a
9  particular issue; right -- in order for this
10 exclusion to kick in?
11   A   Possibly.
12   Q   Okay. Is that because this exclusion
13 requires -- well, it excludes coverage for damages
14 intended or reasonably expected by the insured?
15   A   That's what it says.
16   Q   So what I am trying to get at is this
17 exclusion looks at the standpoint of this insured;
18 right?
19   A   Right.
20   Q   And did you ask Mr. Whiteley whether or
21 not he expected or intended the injury?
22   A   No. I didn't -- didn't get to that point
23 because there was no personal injury offense alleged
24 in the first place. And this is just an additional
25 reason that even if there had been such allegation,

Page 31

1  everything that is alleged again is purposeful,
2  intentional, malicious and would not be covered.
3    Q   Look at the umbrella policy. You cite to
4  this exclusion in your letter. But I don't think
5  there is any discussion of it. The umbrella policy
6  on page 13 -- this is Exhibit 7 D, right here.
7           "This insurance does not apply to
8           personal injury which results from
9           a false statement if done by or at
10          the direction of any insured with
11          knowledge that the statement was
12          false or made with reckless
13          disregard for the truth."
14 Isn't it true that in order to rely on
15 this exclusion you would also have to take into
16 account what the insured says?
17   MR. KASTAN:  Form. Document speaks for itself.
18   THE WITNESS:  Yeah. It will -- it would depend
19 on the situation. It's possible. Yeah.
20 BY MS. CLECICOV:
21   Q   I guess what I am trying to get at is this
22 exclusion similarly looks at the standpoint of the
23 insured the same as the exclusion from the
24 homeowner's policy that we discussed a minute ago.
25   A   Well, again it's situational. There are

Page 32

1  often cases where an insured will say I didn't do
2  something but that is not necessarily determinative
3  if the only possible basis for recovery is
4  something -- a false statement that was knowingly
5  false, then a denial won't necessarily create
6  coverage. But again that is sort of far afield from
7  this situation where there was no allegation that
8  would have triggered coverage in the first place.
9    Q   Okay. Back to Exhibit 6 I am again
10 looking at the coverage determination portion of
11 your letter. Would you agree that the only basis
12 for your denial of coverage for personal injury
13 under the umbrella policy is the argument in that
14 third paragraph?
15   A   No. It is the third paragraph about
16 reserving other potential exclusions and coverage
17 defenses that could apply.
18   Q   Right. Which is in the last paragraph --
19 I guess we can call it the fifth paragraph at the
20 end of your coverage determination section; right?
21   A   Yes.
22   Q   Okay. But other than that, that third
23 paragraph is the only thing that discusses personal
24 injury under the umbrella policy?
25   A   True.

Page 33

1    Q   Okay. Let's talk about the second letter.
2  Well, I guess -- after you issued your first letter
3  and USAA denied coverage, our old firm Pasich got
4  involved and you have seen the letter from
5  Mr. Crosner dated September 5th, 2023 that appears
6  on page 287 of Exhibit 6
7    A   Yes.
8    Q   Would it be fair to say that your second
9  letter was a response to this letter?
10   A   Yes.
11   Q   All right. So the second letter is also
12 not dated but it's attached to a November 8th, 2023
13 E-mail. So we'll just refer to it as the
14 November 8th, 2023 letter.
15   A   Yes. It's not dated because it doesn't go
16 out until it's approved. So --
17   Q   Right.
18   A   The date remains contingent.
19   Q   It starts on page 298. Then page 306 is
20 what I would like to focus on. 307. Page 307.
21 Particularly your response to the points made in the
22 Pasich letter. And you quote:
23          "The BCS action further alleges
24          that Ms. McNamara and her
25          colleagues at Unsilenced including

Page 34

1        Mr. Whiteley made defamatory
2        statements to valued partners
3        resulting in strained and in some
4        cases terminated valued
5        relationships."
6    Your response to that is that:
7        "There are multiple levels of
8        unsupported speculation. First,
9        the complaint does not allege that
10       Mr. Whiteley formed Unsilenced or
11       was ever a member of that
12       organization."
13   Did you see that the complaint had a
14 heading which basically says defendants formed
15 Unsilenced?
16   A   Again, I did not see any allegation that
17 Mr. -- I said here -- I still believe it's
18 accurate -- that it alleged that Mr. Whiteley formed
19 Unsilenced or was a member of the organization.
20   Q   So the fact that there is a heading that
21 says "Defendants formed Unsilenced," that doesn't
22 change your conclusion here?
23       THE COURT REPORTER: We couldn't hear you,
24 Mr. Israel.
25       THE WITNESS: I said "no."

Page 35

1 ///
2 BY MS. CLECICOV:
3   Q   Did you ask Mr. Whiteley if he formed
4 Unsilenced or was a member of that organization?
5   A   No. I didn't. I -- I believe that
6 Mr. Crosner is an excellent coverage attorney. And
7 if such information existed he would have provided
8 it to me.
9   Q   Did you think it was relevant or important
10 for your analysis to know if Mr. Whiteley formed or
11 was a member of Unsilenced?
12   A   Here again, I will just answer the same
13 way. If such factual information existed at any
14 time I would have expected Mr. Crosner to provide
15 that to me. That was not included with his letter.
16   Q   But do you feel that kind of information
17 would be relevant to your analysis or conclusion?
18   A   It wouldn't have changed the conclusion.
19 But had -- you know, I will tell you again -- that
20 if Mr. Crosner thought it was relevant he could have
21 provided it, should have provided it. But he
22 didn't.
23   Q   So it wouldn't -- if you knew Mr. Whiteley
24 formed Unsilenced that wouldn't have changed your
25 conclusion?

Page 36

1   A   No.
2   Q   Did you look at any publicly available
3 information to determine if -- Mr. Whiteley's
4 involvement with Unsilenced?
5   A   No.
6   Q   Did you do any independent investigation
7 to figure out Mr. Whiteley's involvement with
8 Unsilenced?
9   A   No.
10   Q   Did USAA authorize you to do such an
11 investigation or were you limited in any way by
12 USAA?
13   A   I was not limited.
14   Q   Did you gather any other information
15 besides what USAA provided you, anything beyond the
16 policies in the complaint?
17   A   As I indicated I did review some of the
18 pleadings on the Federal court docket.
19   Q   Did you have authorization to speak to
20 Mr. Whiteley?
21   A   I assume I could have received it had I
22 thought that was necessary. But I didn't.
23   Q   But they didn't say -- they didn't --
24 "they" meaning USAA, they didn't limit your access
25 to Mr. Whiteley or his counsel?

Page 37

1   A   Nope.
2   Q   Okay. You didn't have any involvement in
3 communicating with Mr. Whiteley whatsoever?
4   A   Not directly other than through his
5 counsel. I would never have been able to
6 communicate with him directly given the involvement
7 of counsel anyway.
8   Q   Right. Did you ever talk to his counsel?
9   A   Through correspondence.
10   Q   The correspondence that you provided to
11 USAA?
12   A   Yes. Well, I will take that back. The
13 letter I drafted for you was sent by USAA. So I did
14 not directly correspond with Mr. Crosner.
15   Q   What about Mr. Whiteley's underlying trial
16 counsel?
17   A   Same.
18   Q   You did not communicate with them?
19   A   No, I did not.
20   Q   Okay. Did you ever instruct or advise
21 USAA on how to communicate with Mr. Whiteley and
22 what information to communicate to Mr. Whiteley?
23   A   Well, in the sense that I drafted the
24 letters I did. But nothing beyond what is in the
25 letters.

Page 38

1  Q  Right. So if I understand correctly your
2  involvement with this claim was drafting that first
3  letter we looked at and then you looked -- then
4  basically took a second look and drafted a response
5  to Mr. Crosner's letter?
6      A  Exactly.
7      Q  That was the extent of your involvement in
8  this claim?
9      A  Yes.
10     Q  So did you think that you had everything
11 you needed to evaluate this claim?
12     A  Yes.
13     Q  In other words -- sorry.
14     A  Yes. I did.
15     Q  You didn't think you needed any additional
16 information to determine coverage here?
17     A  No. I did not.
18     Q  So given the nature of the allegations
19 that we discussed, do you think it would have been
20 reasonable for you to reach out to Mr. Whiteley or
21 his counsel at the time?
22     A  Typically a coverage determination duty to
23 defend is made by comparing the allegations of the
24 complaint and the terms of the policy. There was
25 nothing I needed beyond that to make the coverage

Page 39

1  determination. And in this particular case the
2  insured was represented by very qualified and
3  sophisticated counsel. And in my 38 years of
4  experience if there is any information -- any
5  factual information and other information that that
6  counsel thinks should be brought to my attention
7  they do so. That is how it typically works.
8      And so I did review Mr. Crosner's letter
9  very carefully. And I did not find it convincing
10 for the reasons you see in the letter before you.
11     Q  I thought Mr. Crosner's letter did state
12 that Mr. Whiteley was involved with -- I'm sorry
13 was -- a member of Unsilenced and helped create
14 Unsilenced?
15     A  That's what --
16     MR. KASTAN:  Is there a question there?
17 BY MS. CLECICOV:
18     Q  Do you recall if Mr. Crosner's letter
19 indicated whether Mr. Whiteley was a member of
20 Unsilenced or created Unsilenced?
21     MR. KASTAN:  Letter speaks for itself.
22     THE WITNESS:  Right. I don't.
23 BY MS. CLECICOV:
24     Q  One second here. We will go back to your
25 second letter here. Were you given latitude to

Page 40

1  investigate this claim?
2      MR. KASTAN:  Form. Vague and ambiguous.
3      THE WITNESS:  Was I given latitude? I was not
4  given any restrictions on what I needed to do to
5  evaluate the duty to defend.
6  BY MS. CLECICOV:
7      Q  So you weren't tasked with an
8  investigation duty or is that something USAA was
9  handling on their own and they were funneling you
10 with information?
11     A  I would say that that's up to me. There
12 are occasions in some matters where I will suggest
13 that the carrier do some inquiry. That can be a
14 whole range of different ways to get additional
15 information. If I thought that was necessary in
16 this case I would have made that recommendation.
17 But I didn't.
18     Q  Do you recall if anyone from USAA
19 disagreed with your ultimate conclusion that there
20 was no duty to defend?
21     A  No.
22     Q  During the time you drafted this second
23 letter was it again Mr. Kaczmarek that you were
24 communicating with?
25     A  Yes.

Page 41

1      Q  Nobody else from USAA; right?
2      A  Not that I recall.
3      Q  Okay. I am almost done here. Do you guys
4  mind if we take a short five-minute break?
5      MR. KASTAN:  No problem.
6      THE VIDEOGRAPHER:  All right. The time is
7  2:26 p.m. We are off the record.
8          (Whereupon, a recess was taken
9          from 2:26 p.m. until 2:40 p.m.)
10     THE VIDEOGRAPHER:  The time is 2:40 p.m.
11 Pacific. We are back on the record.
12 BY MS. CLECICOV:
13     Q  One more last question about the
14 complaint. I will share it here. Highlighted --
15 again paragraph 45 of Exhibit 8 which is the BCS
16 complaint. I have highlighted for you in the middle
17 of that paragraph where it says:
18          "Defendant McNamara and her
19          colleagues at Unsilenced made
20          defamatory statements to valued
21          partners."
22     Can you tell whether these defamatory
23 statements are attributed to Ms. McNamara or
24 Mr. Whiteley?
25     A  They are attributed to Ms. McNamara. They

Page 46

1    (Whereupon, Plaintiff's Exhibit 11
2        was marked for identification
3        by the court reporter and attached
4        hereto after the deposition.)
5    BY MS. CLECICOV:
6    Q   Same thing. July 2022 showing
7    Mr. Whiteley as an advisor for Unsilenced. This
8    wouldn't change your conclusion or analysis in any
9    way?
10   A   No.
11       MR. KASTAN: Counsel, also that was not
12   produced in discovery; correct?
13       MS. CLECICOV: Correct.
14       (Whereupon, Plaintiff's Exhibit 12
15       was marked for identification
16       by the court reporter and attached
17       hereto after the deposition.)
18   BY MS. CLECICOV:
19   Q   Next exhibit, Exhibit 12 same thing, this
20   is from March 2023 showing Mr. Whiteley as advisor
21   for Unsilenced. Is your testimony the same that it
22   would not change your conclusion?
23   A   Yes.
24       MR. KASTAN: And Counsel, this was also not
25   produced; correct?

Page 47

1    MS. CLECICOV: This was not produced. Correct.
2        MR. KASTAN: The only one of these that you
3    produced was Exhibit 9, right?
4        MS. CLECICOV: Yes.
5    BY MS. CLECICOV:
6    Q   Here is another one from November 2023
7    showing Mr. Whiteley as the advisor for Unsilenced.
8    This would not have changed your conclusion?
9    A   No.
10   Q   So if I represented to you today that
11   Mr. Whiteley testified that he in fact did help
12   create Unsilenced and was a member and volunteer of
13   that organization would that change your conclusion?
14   A   No.
15   Q   Why not?
16   A   There are lots of people depicted on those
17   exhibits. And there is still no factual allegation
18   that Mr. Whiteley made a defamatory statement
19   directed at plaintiff.
20   Q   And is it your opinion that this would not
21   create a factual ambiguity?
22   A   No.
23   Q   All right -- that's all I have.
24   A   Okay. Thank you.
25   MS. CLECICOV: Thank you. Josh, do you have

Page 48

1    any questions?
2        MR. KASTAN: I do not.
3        Mark, do you want to reserve signature or
4    do you want to waive?
5        THE WITNESS: I will reserve signature.
6        MS. CLECICOV: Well, thank you so much. We
7    appreciate your time today. Okay.
8        THE WITNESS: My pleasure.
9        MR. KASTAN: Thank you, Mark.
10       THE COURT REPORTER: Hold on. Before you go --
11       MR. KASTAN: If we could get a rush on the
12   transcript please.
13       THE COURT REPORTER: Okay.
14       MR. KASTAN: As soon as you can.
15       THE COURT REPORTER: I can do that today. And
16   also do you want the -- Mr. Israel, if you are going
17   to sign could I get your E-mail address? We can do
18   it off the record.
19       THE WITNESS: Sure. I can put it in the chat
20   if that works.
21       THE COURT REPORTER: Sure. Mr. Kastan, you
22   mentioned you wanted this expedited. I can get it
23   to you tomorrow night or Monday.
24       MR. KASTAN: If you can get it done tomorrow
25   night without completely burning the candle from

Page 49

1    both ends it would be appreciated.
2        THE COURT REPORTER: How about you,
3    Ms. Clecicov?
4        MS. CLECICOV: We would like a rush as well.
5        THE COURT REPORTER: So tomorrow night also.
6        MS. CLECICOV: Sure. Yeah. Thank you.
7        THE COURT REPORTER: Mr. Israel, I don't need
8    you but I need the attorneys. We can go off the
9    record.
10       THE VIDEOGRAPHER: All right. The time is
11   2:51 p.m. The deposition is concluded.
12       We are now off the record.
13       (Whereupon the deposition
14       concluded at 2:51 p.m.)
15       (Whereupon, Plaintiff's Exhibit 13
16       was marked for identification
17       by the court reporter and attached
18       hereto after the deposition.)
19
20
21
22
23
24
25